Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

MASTER PRINTERS ASSOCIATION, A DIVISION OF PRINTING INDUSTRY OF ILLINOIS ASSOCIATION, Defendant.

No. 80 C 1768.

United States District Court, N. D. Illinois, E. D.

Dec. 10, 1981.

Michael S. O'Connell, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Jerry Kronenberg, Lisa S. Kohn, Borovsky, Ehrlich & Kronenberg, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MARSHALL, District Judge.

This case involves a challenge to the Secretary of Labor's ("Secretary") interpretation of § 203 of the Labor Management Reporting and Disclosure Act ("LMRDA" or "Act"), 29 U.S.C. § 433 (1959). The Secretary seeks to compel defendant, Master Printers Association ("Association") to disclose the names and various aspects of its relationship with clients who receive labor relations advice from the Association. The Association contests the Secretary's interpretation of the Act and alternatively raises several constitutional objections to the disclosure requirements. Both sides have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.Pro. and exhaustive briefs have been filed. The records and files of the case present no genuine issues of material fact and the case is ready for decision.

## I

The facts are not in dispute. The Association is an unincorporated trade organization comprised of approximately 800 non-union printing shops. The purpose of the Association is, in part, to counsel and advise its members on how to keep their employees unorganized. To this end the Association provides a variety of services for its members, including literature, meetings and counseling on how to maintain "open" shops, and establishing credit unions and other benefit programs for the unorganized employees. Affidavit of Robert Lindgren, Exhibit D.

In 1976 the former executive director of the Association made three separate speeches directly to employees of three of its member employers. The Secretary, pursuant to Title II of the LMRDA, Section 203, 29 U.S.C. § 433(b), determined that these speeches constituted "persuader activity" within the meaning of the Act and therefore ordered reports and disclosure of the relationship between the Association and those employers. In addition the Secretary ordered the Association to report the names and disbursement records of all other employers who had received labor relations advice regardless of whether they received persuader services. The Association filed the required reports for the three employers, but refused to comply with respect to its other member-employers. The Secretary instituted this action to compel disclosure. The questions presented here are whether the LMRDA supports the broad disclosure interpretation urged by the Secretary and, if it does, whether the reporting sections of the Act can withstand constitutional scrutiny.

## II

The LMRDA grew out of the lengthy and well publicized McClellan Committee investigations into organized labor in the late 1950's.[1] The legislation which ultimately

---

1. See Interim Report of the Select Committee on Improper Activities in the Labor or Manage-

passed after several years of debate and many attempts dealt primarily with insuring internal union democracy and public disclosure of union financial arrangements.[2] In addition, the LMRDA and its precursors, the Kennedy-Ives Bill, S. 3974, 85th Cong., 2d Sess. (1958), the Kennedy-Ervin Bill, S. 505, 86th Cong., 2d Sess. (1959), and finally S. 1555, 86th Cong., 1st Sess. (1959) authored by Senator John F. Kennedy, focused on the influence of "middlemen" employed by management to influence employees in the exercise of their rights under § 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157 (1976). The Senate Report accompanying the Act explained:

It is also plain that there are important sections of management that refused to recognize that the employees have a right to form and join unions without interference and to enjoy freely the right to bargain collectively with their employer concerning their wages, working conditions, and other conditions of employment.... [Employers] have employed so-called middlemen to organize "no-union committees" and engage in other activities to prevent union organization among their employees. They have financed community campaigns to defeat union organization. They have employed investigators and informers to report on the organizing activities of employees and unions. It is essential that any legislation which purports to drive corruption and improper activities out of labor-management relations contain provisions dealing effectively with these problems.

S.Rep. 187, 86th Cong., 1st Sess. at 10 *reprinted in* [1959] U.S.Code & Admin.News 2318, 2322–23 (1959).[3]

It is clear that Congress did not look favorably on the activity of outside consultants and believed they frequently engaged in practices of questionable legality.

The committee notes that in almost every instance of corruption in the labor-management field there have been direct or indirect management involvements [sic]. The report of the McClellan committee describes management middlemen flitting about the country on behalf of employers to defeat attempts at labor organization....

The committee believes that employers should be required to report their arrangements with these union-busting middlemen. Further, the Committee on Labor and Public Welfare has received evidence in prior hearings showing that large sums of money are spent in organized campaigns on behalf of some employers for the purpose of interfering with the right of employees to join or not to join a labor organization of their choice, a right guaranteed by the National Labor Relations Act. Sometimes these expenditures are hidden behind committees or fronts; however the expenditures are made, they are usually surreptitious because of the unethical content of the message itself. The committee believes that this type of activity by or on behalf of employers is reprehensible. These ex-

ment Field [McClellan Report], S.Rep. 1417, 85th Cong., 2nd Sess. (1958).

2. The Act contains the so-called Bill of Rights for union members and requires far more extensive reporting and disclosure requirements of unions and their officers than it does of employers and consultants. See §§ 101–105, 201, 202, 301–306, 401–403, 501–504, 29 U.S.C. §§ 411–415, 431, 432, 461–466, 481–483, 501–504 (1976).

3. There is a great deal of legislative history accompanying the LMRDA as passed and the two preceding attempts (Kennedy-Ives and Kennedy-Ervin) which failed in the House. The parties at various places in their several briefs refer to reports and comments on all

three bills coming from a variety of sources. Unfortunately, while there have been several extensive compilations of the history of this legislation, no one source contains all of the statements relied on by the parties or this opinion. We have drawn from three separate sources: [1959] U.S.Code & Admin.News 2318 (1959); Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, National Labor Relations Board (1959) [hereinafter cited as Leg.Hist. (NLRB)]; Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, Department of Labor (1960) [hereinafter cited as Leg.Hist. (Labor)].

penditures may or may not be technically permissible under the National Labor Relations Act ..., or they may fall in a gray area. In any event, where they are engaged in they should be exposed to public view, for if the public has an interest in preserving the rights of employees then it has a concomitant obligation to insure the free exercise of them.

S.Rep., *supra* at 2326–37.

In response to the problems outlined above the LMRDA provides criminal sanctions for improper payments by middlemen to employees [4] and requires disclosure of the employer-middlemen relationship. Section 203 of the Act, 29 U.S.C. § 433 (1976), provides in relevant part:

(b) Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly—

(1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; or

(2) to supply an employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;

shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind in connection with such services and the purpose thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.

(c) Nothing in this section shall be construed to require any employer or other person to file a report covering the services of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such employer with respect to wages, hours, or other terms or conditions of employment or the negotiation of an agreement or any arising thereunder.

It should be apparent from reading the Act that the language of paragraphs (b) and (c) requires reconciliation. What the Act requires in terms of reporting obligations in paragraph (b) it appears to exempt in paragraph (c). As one commentator noted,

There seems to be some confusion, however, concerning whether a consultant who has an agreement with any one employer to persuade employees or to furnish information must then include in his annual report receipts from, and disbursements on behalf of, all other employers for whom he has performed labor-relations services that would otherwise not have to be reported. Read literally, section 203(b) seems to compel that conclusion; but the opposite conclusion is indicated by section 203(c), which specifically states that consultants need not report the mere giving of advice to employers, or the representation of employers in an arbitration, administrative, or judicial

4. See § 505, 29 U.S.C. § 186 (1976).

1144

proceeding. This is another example of the ambiguities produced by the inartistic draftsmanship which characterizes much of the statute.

Aaron, *The Labor Management Reporting and Disclosure Act of 1959*, 73 Harv.L.Rev. 851, 891 (1960). It is precisely this ambiguity that we are called upon to resolve in the case at bar.

■ The Secretary reads § 203(b) to require the reporting of receipts and disbursements for *all* clients who received any labor relations advice if a labor consultant engages in *any* persuader activity.[5] Thus, the Secretary treats the rendering of persuader services as a trigger which compels full disclosure of information otherwise non-reportable under § 203(c). The sole function of paragraph (c) is to exempt from the filing requirements labor consultants who engage in no persuader services and limit their activity to the giving of advice and the representative functions listed in the Act. A consulting firm must confine itself solely to non-persuader activity unless it wants to incur a duty to make financial disclosure as to all its clients, even those who receive only advice outside the scope of direct or indirect employee persuasion. Plaintiff's Memorandum in Support at 6–8.

The defendant offers several counter interpretations of the Act, urging that it can be best reconciled by restricting the reporting requirement to all labor relations services—including advice—to any employer who receives persuader services, but *not* to employers who receive only non-persuader services. Defendant's Memorandum in Support at 20–22.[6] Defendant argues that this interpretation is preferable because the Secretary's reading of the statute renders section (c) a mere repetition of what is already apparent from section (b). *Id.* at 23. Defendant further argues that this in-

terpretation is consistent with the Congressional purpose of focusing the "floodlights of publicity" on those who provide persuader services. Only where there is persuader activity—contact between the consultant and employees—did Congress exhibit a concern sufficient to require the report of receipts and disbursements.

Both parties argue that the considerable legislative history accompanying the Act supports their view; and both sides agree that judicial interpretation to date generally supports the Secretary's interpretation of the Act. *See Douglas v. Wirtz*, 353 F.2d 30 (4th Cir. 1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665 (1966); *Wirtz v. Fowler*, 372 F.2d 315 (5th Cir. 1966) *overruled, Price v. Wirtz*, 412 F.2d 647 (5th Cir. 1969) (en banc). For the reasons stated below, we find that the Secretary offers the proper construction of the Act and as construed the reporting sections do not violate defendant's constitutional rights.

The Fourth Circuit in *Douglas*, the first case to address the subject reporting requirement of the LMRDA, held, in a 2–1 opinion, that § 203 requires the reporting of all advice given by a labor relations consultant who engaged in even a single instance of persuader activity. The Fifth Circuit initially took the contrary view in *Wirtz v. Fowler*, but reversed itself, *en banc*, in *Price v. Wirtz*.

The *Douglas* court recognized the apparent conflict between paragraphs (b) and (c) and held "[a] reasonable reconciliation ... is to compel the reporting of all income and expenditures in connection with labor relations advice and services, given or rendered aside from the persuasion activities, if the [consultant] has within the same reporting period also either acted or received payment as a persuader under § (b)(1)." *Douglas* at 32. The court focused on the "by reason of" language in section (c) and concluded:

5. The Secretary's view is well presented in a 1965 article by the then Associate Solicitor of the United States Department of Labor. See Beaird, *Reporting Requirements for Employers and Labor Relations Consultants in the Labor-Management Reporting and Disclosure Act of 1959*, 53 Geo.L.J. 267 (1965) [hereinafter cited as Beaird, *Reporting Requirements*].

6. For an argument in support of the defendant's position, see generally, Note, *Two Views of a Labor Relations Consultant's Duty to Report Under Section 203 of the LMRDA*, 65 Mich.L.Rev. 752 (1967) [hereinafter cited as Note, *Two Views*].

... advice in itself and alone does not create an obligation to report. But the two sections together declare that when persuasion services or receipts therefor and independent advice occur in the same fiscal year, all of them must be reported. *Id.*

In addition, *Douglas* relied on passages from two Senate Committee reports which indicate that a consultant who "confines himself to giving legal advice" or other activities listed in 203(c) need not report. *Douglas* at 33, *quoting* S.Rep. 187, *supra.* By using the word "confines" Congress intended that any provision of persuader services forfeited the exemption. *Id.* The opinion of the Fifth Circuit in *Price* follows the *Douglas* reasoning. *See Price* at 649. The court stated the matter succinctly: "[D]isclosure of all labor relations advice is the price the attorney-persuader must pay if he wishes to engage in those activities." *Id.* at 650.

Defendant vigorously contends that the Fourth and Fifth Circuit erred in their construction of the Act. We disagree. The Association's principal argument is that the *Douglas* interpretation renders section (c) meaningless—a mere "truism that the non-reportable giving of advice does not give rise to a duty to report." Note, *Two Views,* at 756. They also contend that by using the language "an object" in section (b) the drafters indicated disclosure is required only where advice is accompanied by persuasion—i.e. the argument has more than one object. Finally, defendant relies on a number of comments in the extensive legislative history indicating that the main thrust of Congressional concern was persuader activity, not the giving of advice outside persuader agreements.[7]

Contrary to defendant's argument, our reading of the statute does not render sec-

tion (c) meaningless. Rather, it stands as a gloss on the potentially confusing language of section (b) and indicates that engaging in the activities listed in section (c) does not, in and of itself, give rise to a duty to report. The opening language of section (c), "Nothing in this section shall be construed to require ...," supports the view of (c) as a clarification designed to avoid confusion. Moreover, the committee report accompanying the Kennedy-Ives Bill, where the management disclosure requirement originated, states:

> Section 103(b) requires a labor-relations consultant to file a financial report upon his labor-relations activities if he undertakes to influence or affect employees in the exercise of their rights guaranteed by the [NLRA] ... Since attorneys at law and other responsible labor-relations advisors do not themselves engage in influencing or affecting employees in the exercise of their rights ... an attorney or other consultant who confined himself to giving advice, taking part in collectively bargaining and appearing in court and administrative proceedings [would not] be required to report. *Although this would be the meaning of the language of the section 103(a) and (b) in any event, a proviso to section 103(b) guards against misconstruction.*

S.Rep. 1684, 85th Cong., 2d Sess. (1958) *reprinted in* Leg.Hist. (Labor) at 390 (emphasis added).

Both parties agree in their briefs that reliance on commentary to the Kennedy-Ives Bill is appropriate because it is similar in content and structure with the LMRDA. Section 103(b) referred to in the quoted comment is almost identical with section 203(c) of the Act. The proviso in the original bill ultimately became section 203(c). Thus, the statement that the exemption is

---

**7.** Plaintiff, in its initial brief addressing the statutory question at issue, relied on the statements of two opponents of the Act. It has frequently been stated, and defendant was quick to point out in response, that reliance on the statements of opponents is inappropriate when construing an act. *See NLRB v. Fruit Packers,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12

L.Ed.2d 129 (1964); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951). We assure defendant that we have placed no stock in the interpretation offered by these opponents and rely instead on the legislative history and statutory language cited herein.

included merely to guard against misconstruction is particularly persuasive.[8] Further, we agree with the courts in *Douglas* and *Price* that the "by reason of" language is a strong indication that the purpose of section (c) is to avoid any reliance on the giving of advice alone as a trigger for the consultant's duty to report.

Like the court in *Price*, we believe that the legislative history supports, if it does not compel, this view. *Price* at 650. Defendant places considerable weight on the statement of Senator Kennedy discussing the predecessor legislation:

> The Senate passed bill . . . contained a strong detailed provision requiring employers and middlemen to report transactions and arrangements as well as payments and expenditures for activities intended to influence or affect employees in the exercise of rights guaranteed by the Labor Act.

Cong.Rec., 19033–34 (1958), *reprinted in* Leg.Hist. (Labor) at 486. But no one is arguing in this case, least of all the Secretary, with the contention that persuasion is the principal evil addressed by the statute.

**8.** The relevant section of the Kennedy-Ives Bill, S. 3974, is as follows:

> (b) Every person engaged in providing labor relations consultant service to an employer engaged in an industry affecting commerce pursuant to any agreement or arrangement under which such consultant undertakes—
>
> (A) to influence or affect employees in the exercise of their rights guaranteed by Section 7 of the National Labor Relations Act, as amended, or by the Railway Labor Act, as amended, or
>
> (B) to provide an employer involved in a labor dispute with the services of paid informants or investigators, or any agency or instrumentality engaged in the business of interfering with, restraining, or coercing employees in the exercise of rights guaranteed by section 7 of the National Labor Relations Act, as amended, by the Railway Labor Act, as amended, or
>
> shall file annually a report with the secretary [sic], signed by its president and treasurer or corresponding principal officers, containing the following information:
>
> (1) the name under which the labor relations consultant is engaged in doing business and the address of its principal place of business;

The question here is the scope of the reporting obligation incurred by one who has engaged in persuader activity. Senator Kennedy's remarks simply do not address that issue.

The defendant also relies on a statement by Senator Goldwater as one of the Senate conferees that § 203 requires "a report from an employer and labor relations consultant of any agreement or arrangement whereby the labor relations consultant undertakes activities to persuade employees in the exercise of their rights." Defendant's Answering Memorandum at 29. But defendant fails to include Sen. Goldwater's description of the *content* of the report once the duty is incurred:

> First. File a report with the Secretary within 30 days of entering into the agreement or arrangement giving all details concerning it.
>
> Second. File annually with the Secretary for the preceding fiscal year if he received *any* payments pursuant to an agreement or arrangement, a report setting forth *all* receipts from *all* employers, and the sources thereof, on account of

> (2) receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof;
>
> (3) disbursements of any kind, in connection with such services and the purposes thereof; and
>
> (4) a detailed statement of such agreement or arrangement.
>
> Provided, That nothing in this section shall be construed to require a report from a labor relations consultant retained by an employer by reason of his giving advice to such employer or representing such employer in any court or administrative agency or engaging in collective bargaining on behalf of such employer with respect to wages, hours, or other terms or conditions of employment or the negotiation of an agreement or any question arising thereunder.

We note that it is the defendant who urged this court to rely on statements regarding the earlier bills as relevant to the Act "Senator Kennedy's remarks are equally applicable to the language of Section 203 of the Act, since the reporting requirements in the Act are virtually identical in material parts to the requirements of the Kennedy-Ives bill . . . (Defendant's Memorandum in Support at 28–29).

labor relations advice or services, as well as any disbursements and their purposes in connection with such services, .... Leg.Hist. (Labor) at 624.[9]

This interpretation is consistent with the House conferees statement that § 203(c) "grants a broad exemption from the requirements of the section with respect to the giving of advice." Conf.Rep. 1147, 86th Cong., 1st Sess., *reprinted in* [1959] U.S. Code & Admin.News, at 2505. Given the Congressional findings regarding the propensity of management middlemen to engage in or encourage unfair labor practices, Congress might have sought to require disclosure of the existence of employer-consultant relationships even where the consultant refrained altogether from persuader activity. Instead, Congress did grant a broad exemption, one given its full scope by our interpretation: any consultant or attorney who "confines himself" to giving advice or the representative functions listed incurs no obligation to report. The numerous reports on various versions of the Senate bill ultimately passed by the Congress indicate that the exemption was designed to accommodate those who have nothing to do with attempts to persuade employees in the exercise of their § 7 rights. *See* S.Rep. 1684, *supra, reprinted in* Leg.Hist. (Labor) at 394; S.Rep. 187, *supra* at 2356–57. We agree with the courts in *Douglas* and *Price* that once a consultant, such as Master Printers Association, engages in persuasion of employees, they trigger the obligation to report all labor relations advice rendered in that reporting year.

### III

The defendant next argues that the Act, if so construed, violates the first amendment rights of the Association and its members. As indicated earlier, the Association was formed, in part, to promote its members' belief in "open" shops. It assists member-employers in the conduct of their labor relations activities. Defendant correctly points out that Congress has specifically provided, and the Supreme Court has held, that employer speech in the labor relations field is protected under the Constitution. See § 8(c) of the NLRA, 29 U.S.C. § 158(c); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ The Act, however, does not prohibit any speech by either employers or labor relations consultants. Rather it compels disclosure of the financial data and clients of those who engage in a certain type of activity. We recognize that it is well settled that compelled disclosure has the potential to infringe upon first amendment freedoms. *See, e.g., Gibson v. Florida Legislative Investigation Commission*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Louisiana v. NAACP*, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It is equally well settled that disclosure requirements are permissible provided that the chill placed on a person's first amendment rights is justified by a sufficient purpose behind the legislation. *California Medical Ass'n v. FEC*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975) (per curiam); *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

The standard for examining disclosure requirements against first amendment attack was set out and discussed at length in *Buckley v. Valeo*, where the Court upheld the reporting and disclosure provision of the Federal Election Commission Act of 1971, 2 U.S.C. § 431 et seq. (1976).[10]

---

9. We rely, once again, on defendant's brief for an explanation of Senator Goldwater's role in the legislation. Defendant's Answering Memorandum at 27. While Senator Goldwater was originally an opponent of the bill, he was a member of the conference committee and supported the bill as it emerged from the conference and ultimately became law.

10. The FEC requires reporting of any campaign contribution over $10, with additional information for contributions over $100, 2 U.S.C. § 432(c), (d), accompanied by public disclosure

**1148**

Since *NAACP v. Alabama* we have required that the subordinating interests of the State must survive exacting scrutiny. We also have insisted that there be a "relevant correlation" or "substantial relation" between the governmental interest and the information required to be disclosed [citations omitted]. This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure.

424 U.S. at 64–65, 96 S.Ct. at 656–657.

Defendant contends that both it and its members will be chilled in the exercise of their first amendment rights if forced to disclose the existence of their employer-consultant relationship. Defendant asserts that employers who do not use persuader services are discouraged from associating with those who do because they fear "public opprobrium" resulting from organized labor's campaign to "vilify" management consultants. They also fear that reliance on advice from a consultant might become an issue in collective bargaining and employee relations. Finally, defendant argues that the Association itself is chilled because the threat of compelled disclosure of all clients who receive advice, given their clients' desire to keep their relationship private, keeps them from engaging in any direct contact with employees. Defendant's Closing Memorandum at 22–24. As proof of the reasonableness of these fears defendant points to the affidavit of its past executive director attesting to the fact that since the Secretary's order of disclosure the Association has refrained from all persuader activity. Lingren Aff. ¶ 12.

of all reported information. 2 U.S.C. § 438(a)(4).

11. The allegations of chill here, while they are not inconsequential, fall far short of the sort of threat of physical harm and loss of employment found in *NAACP v. Alabama* and its progeny. At most what defendant has alleged is that its members fear criticism of their business practice of dealing with a labor relations

We are somewhat skeptical of the "fears" claimed by the defendant,[11] but even accepting their allegations as true, we do not believe they make out a claim under the first amendment. The Court in *Buckley* held,

we have acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the "free functioning of our political institutions" is involved. [citation omitted].

The governmental interest sought to be vindicated by the disclosure requirements are of this magnitude.

424 U.S. at 66, 96 S.Ct. at 657. As in *Buckley*, the governmental interests advanced by the reporting and disclosure provisions of the LMRDA are sufficient to justify any of the chilling effects alleged by the defendants.

We deal here with the unique and pervasively regulated area of labor relations law. Congress has set out one of the most detailed legislative and administrative frameworks in our history to promote the free flow of commerce and replace the economic warfare of the nineteenth century with a system designed to encourage industrial peace. The Supreme Court has recognized that even first amendment rights may be required to yield to the special needs of the labor relations field:

Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, . . . . And any balancing of those rights must take into account the economic dependence of the employees on their employers, and

consultant and possible economic harm (though they have not indicated its source) in the conduct of their labor relations. We do not foreclose the possibility that on different facts, with an alleged chill of greater magnitude, the statutory disclosure requirement might have to give way to the first amendment interest. See *Buckley v. Valeo*, 424 U.S. at 69–72, 96 S.Ct. at 658–60.

the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear. Stating these obvious principles is but another way of recognizing that what is basically at stake is the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation ...

*NLRB v. Gissel Packing Co.*, 395 U.S. at 618–19, 89 S.Ct. at 1942–43. The Court has permitted restrictions even on the *content* of employer speech by classifying as an unfair labor practice statements outside the scope of well drawn boundaries. *Gissel*, at 618–19, 89 S.Ct. at 1942–43; *J.P. Stevens & Co. v. NLRB*, 638 F.2d 676, 686 (4th Cir. 1980); *Chromalloy Mining and Minerals v. NLRB*, 620 F.2d 1120, 1124 (5th Cir. 1980); *Nebraska Bulk Transport, Inc. v. NLRB*, 608 F.2d 311, 314 (8th Cir. 1979); *NLRB v. Gogin*, 575 F.2d 596, 600 (7th Cir. 1978).

In a labor setting "the Court has concluded that an employer's freedom to communicate his views to his employees may be restricted by the requirement that any predictions 'be carefully phrased on the basis of objective fact'" even though "[s]uch restrictions would clearly violate First Amendment guarantees if applied to political expression concerning the election of candidates for public office." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 778, 96 S.Ct. 1817, 1833, 48 L.Ed.2d 346 (1978) (Stewart, J., concurring). Clearly, the context of the regulation sets the framework for our first amendment analysis. *Id. See also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

The reporting and disclosure provisions of the LMRDA are supported by extensive findings of the danger posed by middlemen in the labor relations field. In its declaration of findings, purposes and policy, made part of the statute, Congress stated:

The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives.

§ 2(b), 29 U.S.C. § 401(b).

The record is replete with evidence that Congress believed that "union busting" management middlemen were working with employers to undermine employees in their attempt to exercise their § 7 rights. Those activities include direct employee contact, spending large sums of money behind the scenes or through committees to distribute distorted information, setting up company dominated unions, and other practices that Congress felt were unethical if not illegal. S.Rep. 187, *supra.* See also, Cong.Rec. 11374–77, 86th Cong., 1st Sess. (1959), *reprinted in* Leg.Hist. (Labor) at 561–63. The Senate Committee concluded:

All of the activities required to be reported by this section are not illegal nor are they unfair labor practices. However, since most of them are disruptive of harmonious labor relations and fall into a gray area, the committee believes that if an employer or a consultant indulges in them, they should be reported.

S.Rep. at 187, *supra* at 2328. Thus, it appears that the committee was mindful of the advice of Mr. Justice Brandeis, recalled by the Court in *Buckley,*

Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.

424 U.S. at 67, 96 S.Ct. at 657, *quoting* L. Brandeis, Other People's Money 72 (1933).

1150

The fact that persuader contact and advice is not itself illegal is not dispositive. What counts is that Congress found a strong connection between corruption in the labor field and the activities of management persuaders. Similarly in *Buckley* a vast majority of campaign contributions have absolutely no corrupting influence on the political process, yet the Court permitted compelled disclosure of practically all campaign contributions because "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributors and expenditures to the light of publicity." 424 U.S. at 67, 96 S.Ct. at 657. Moreover, disclosure serves the purpose of letting the voters know where their information comes from, and last, but "not least significant, record keeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations described above." *Id.* at 67–68, 96 S.Ct. at 657–658.

We find that justifications for the disclosure requirements in the LMRDA remarkably similar to those of the Federal Election Commission Act discussed in *Buckley.* The disclosure permits employees in a labor setting, like voters in an election, to understand the sources of the information being distributed. See also §§ 201, 202, 29 U.S.C. §§ 431, 432 (requiring extensive reporting from labor organizations and their officers). The annual report serves as a crosscheck on the accuracy of the 30 day reports and serves to notify the Secretary of relationships between a persuader and employer which may give rise to a duty to file a 30 day report. More importantly, as we have outlined above, Congress viewed management persuaders as inherently suspect and their activities subject to abuse in an extremely sensitive field. Disclosure is therefore justified as a means of discouraging potential abuse where there is a demonstrated propensity for such abuse. See *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Marshall v. Stevens People and Friends for Freedom,* 669 F.2d 171, 108 LRRM 2024 (4th Cir. 1981).[12] Finally, it must be remembered that the evil Congress was addressing was not "persuasion" in and of itself, but the tendency of persuaders to engage in unfair labor practices. Thus, the Act would be less than effective if it permitted the targets of the publicity to be entirely free from public scrutiny where they are able to couch their function as "advice" rather than persuasion. As the Fifth Circuit recognized in *Price*:

> The legislative judgment that one who engages in the persuader business must be subjected to the pressure of revealing publicity is amply justified by the difficulty in distinguishing between those activities that are persuader activities and those that are not, and by the opportunity for misleading concealment of the true nature of such [persuader's] work in situations involving intricate corporate conglomerate associates or, equally pressing, industry wide labor controversies.

412 F.2d at 650.

The Association contends, relying principally on *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir. 1980), that while these purposes may justify disclosure of the employers who use persuader services, the Act is unconstitutionally overbroad in so far as

12. Our judgment is entirely consistent with the Fourth Circuit's opinion in *Marshall v. Stevens People and Friends for Freedom,* where the court engaged in a similar inquiry and upheld the subpoena power of the Secretary under the same act against first amendment attack. See § 601, 29 U.S.C. § 521. The Fourth Circuit found the broad subpoena power justified by a substantial and well founded Congressional concern with abuse in the labor field sufficient to outweigh the associational claims of the non-employee defendants. *Id.* at 179. The interests advanced by the Secretary "are substantially related to the information that he seeks." *Id.* We find the same is true of the disclosure requirement. The court did not allow use of the subpoena power, however, to obtain lists of the non-supervisory employees working at J.P. Stevens who organized in opposition to the union. As to them, the court found *no* governmental interest in disclosure because the statute by its very terms maintains protection for *employees* to exercise their section 7 rights—including organizing against a union. *Id.* at 179.

it requires reporting of employers who receive only advice. In *Familias Unidas* the Fifth Circuit struck down a statute requiring disclosure of all members of any organization encouraging interference with the peaceful operation of the public schools. 619 F.2d at 394. The court found the statute overbroad because "the mere presence of an individual's name on an organization's membership rolls is insufficient to impute to him the organization's illegal goals." *Id.* at 401, *quoting United States v. Robel*, 389 U.S. 258, 266 n. 16, 88 S.Ct. 419, 425 n. 16, 19 L.Ed.2d 508 (1967). With respect to people without knowledge of the organization's illegal activity "disclosure bears no relationship at all to the state interest in deterring school disruption." *Id.* at 401.

Defendant's reliance on *Familias Unidas* is misplaced. The Texas statute in question there contained no legislative history; the court assumed its sole rationale was that

> [b]y raising the spectre of public scrutiny and opprobrium for individuals supporting organizations engaged in disruptive activities, section 4.28 is intended to deter participation in, active support of, and affiliation with such groups and activities.

*Id.* at 400. The organizations in question were essentially political with no past history of any illegal or suspect activities. The court took care to distinguish its holding from cases where the "organizations [have] a demonstrated track record of illicit conduct ..." *Id.* at 401. *See Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *Bryant v. Zimmerman*, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928). As we have outlined several times, Congress believed that those who engage in persuader services had just such a track record in the sensitive field of labor-relations.

But more importantly, what defendant fails to recognize is that this is not a membership case at all. Merely belonging to the Association does *not* require reporting. Disclosure under the LMRDA is only triggered by a specific relationship—some type of labor relations contact—with an organization engaged in a suspect activity. By focusing on the employer who receives only advice and no persuader services, defendant has sought to deflect us from the proper subject of the inquiry—the persuader. There are two parties in every agreement which must be disclosed under § 203. While Congress may not have demonstrated a legitimate concern with the employers receiving only advice, it did demonstrate substantial justification for keeping an eye on those who engage in persuader activity—here the Association itself. Thus, unlike the statute in *Familias Unidas*, the scope of the reporting requirement in the Act is tailored to meet a concern articulated by Congress and supported by a compelling state interest. See *California Medical Ass'n*, 101 S.Ct. at 2722–23 n. 20.

Finally, the defendant argues vigorously that it does not engage in unfair labor practices or any of the other persuader activities Congress thought were undermining national labor policy; that it is, in short, a good guy:

> The Association has merely promoted its members' common belief in the value of open shops in the printing industry. It has informed its members of new technological, legislative and political developments affecting the printing industry; it has advised its members of good management practices that will prevent employee dissatisfaction and inefficiency; it has sponsored employee benefits competitive with those available through union representation. All of these efforts promote better working conditions and industrial peace.... Yet merely because the Association assisted three members by speaking on their behalf directly to their employees, without violating the law or urging others to violate the law, the Secretary now seeks to class the Association with the traditional "union busters" ...

Defendant's Closing Memorandum at 5.

We express no opinion as to defendant's particular labor relations practices. The record before us does not contain information on how defendant advises its clients, nor does that concern us. Regardless of the

Association's business ethics, we are not free to substitute our judgment for the clear expression of Congressional intent. Congress deemed the management middleman who engages in persuasion of employees as inherently suspect; that judgment is supported by adequate findings and operates in a sensitive area of great national interest. The Association fits the Congressional definition of a persuader and it must therefore comply with the Secretary's order and submit the required information.

## IV

Defendant urges three other grounds in challenging the statute and the Secretary's order. While we have considered these arguments at length, we deal with them somewhat summarily.

■ The Association contends that the statute is so vague that it violates the due process clause of the fifth amendment. It suffices to say that the Act is only vague because defendant chooses to make it so. The opinion of the Fourth Circuit in *Douglas* and the Fifth Circuit in *Price* have stood without any change by Congress in the statute since 1965. While we admit that the structure and language of the Act are not a model in legislative drafting, the consistent construction by the courts leaves little doubt as to the proper interpretation of the Act.[13] See *Grayned v. City of Rockford*,

408 U.S. 104, 109–10, 92 S.Ct. 2294, 2299–2300, 33 L.Ed.2d 222 (1972); *United States v. Harriss, supra; United States v. Heilmen*, 614 F.2d 1133, 1136–38 (7th Cir. 1980); *Amato v. Divine*, 558 F.2d 364, 365 (7th Cir. 1977); *Sheehan v. Scott*, 520 F.2d 825, 829 (7th Cir. 1975).

■ The Association also argues that the reporting requirements constitute an unreasonable search and seizure in violation of the fourth amendment. It makes the point that reporting and disclosure requirements can violate the fourth amendment if they amount to an unreasonable invasion of privacy and are unrelated to any permissible state interest. See *California Bankers Association v. Schultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

While commercial enterprises benefit from the protection of the fourth amendment, see *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the privacy interest asserted by the defendant is significantly diminished where, as here, we deal with businesses engaged in operation for profit.[14] The Court has recognized that in a disclosure setting "neither incorporated nor unincorporated associa-

---

**13.** Defendant argues that neither the courts nor the Secretary have maintained a consistent interpretation of the statute and cite as authority a decision by the District Court for the Eastern District of Virginia in *Donovan v. Master Printers Association*, No. 80–1040A (E.D.Va. April 15, 1981). Once again, defendant's reliance is misplaced. At issue in that case was the entirely separate question of *whether* the defendant engaged in any persuader activity, not the scope of the duty to report once persuader activity is engaged in. The court held that "under the facts of this case MPA, as distinguished from the employers involved, is not undertaking activities which have as an object persuasion of employees." Id. at 1. The court found that *all* of the activities at issue in that case constituted advice.

Further, the policy of the Department of Labor cited by the court deals with defining the difference between advice and persuasion—not the question of what are the reporting obligations of a persuader. Id. at 4. We express no opinion as to whether we agree with the Virginia court on the issue of what constitutes persuasion because that question is not before us.

**14.** We note that in certain pervasively regulated industries, where the governmental interest is especially strong and long standing, no showing of probable cause is necessary before a physical search is conducted. *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Moreover, even where the fourth amendment applies, all the government need show to obtain a warrant is that the search is in accord with a reasonable administrative plan in conformity with statutory authority; far less than the traditional probable cause standard. See *Marshall v. Barlow's, Inc.*, 436 U.S. at 320–21, 98 S.Ct. at 1824–25.

tions can plead an unqualified right to conduct their affairs in secret." *California Bankers Association,* 416 U.S. at 66–67, 94 S.Ct. at 1519–1520 *quoting Morton Salt,* 338 U.S. at 652, 70 S.Ct. at 368. The fourth amendment simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant. *Id.*

It is unnecessary for us to engage in a protracted discussion of the difficult question of whether § 203 amounts to a search and seizure because, as our discussion of the statute and first amendment indicates, there is nothing "unreasonable" about the reporting and disclosure of this Act. *California Bankers Association* at 67–70, 94 S.Ct. at 1520–1521.[15]

Finally, defendant argues that the government should be estopped from requesting further reports in this case. The estoppel argument is based on a letter from the Department of Labor to the defendant dated June 9, 1978.[16] Defendant argues that the letter constitutes a settlement upon which defendant detrimentally relied in filing the 30 day report for the three employers who received persuader services. At this point we adopt the recent statement of Judge Bauer that "[w]e tire of arguments of expediency addressed to us under the guise of principle." *Gibbons v. United States,* 660 F.2d 225 at 229 (7th Cir. 1981).

While it is no longer true that the government can never be estopped, the "doctrine of estoppel must be applied with great caution to the government and its officials." *United States v. Gross,* 451 F.2d 1355, 1358 (7th Cir. 1971). *See also Champaign County v. United States,* 611 F.2d 1200, 1205 n. 8 (7th Cir. 1979). This is particularly true where the estoppel would prevent the effectuation of Congressional intent by altering the meaning of a statute. In such a situation estoppel will only be applied on proof of affirmative misconduct on the part of the government causing severe injury to the party affected. *See Leimbach v. Califano,* 596 F.2d 300 (8th Cir. 1979); *California Pacific Bank v. SBA,* 557 F.2d 218 (9th Cir. 1977); *Santigo v. INS,* 526 F.2d 488 (9th Cir.), *cert. denied* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1975); *cf. United States Immigration & Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973).

In the case at bar we find neither affirmative misconduct nor the type of injury to the defendant required in order for an estoppel to apply. There is no indication in the letter from the Department to the defendant, nor any other evidence presented to this court, that the parties entered into a settlement of the question being litigated here. At most the letter could lead defendant to believe its interpretation of the requirements of the Act was correct, despite the holding of the Fourth and Fifth Circuits to the contrary.[17] However, a

---

**15.** Defendant bases its argument on the same grounds as its first amendment attack: that the scope of the disclosure requirement bears no relationship to any legitimate state purpose. Defendant's Closing Memorandum at 28–32. Since we have discussed the reasonableness of the reporting requirement at length in our discussion of the first amendment, we do not repeat it here.

**16.** The letter relied on by defendant refers to discussions between the Association's Executive Director and a Department of Labor "Compliance Officer" and describes the contact between the Association and employees on three occasions. The letter states in relevant part:
> You are therefor required to file an LM–20 Agreement and Activities Report for each of the three above-named Companies, along with LM–21 Receipts and Disbursements Re-

ports for each, for the fiscal year covering the dates of the respective meetings in 1976. In view of the fact that these reports were actually due some time ago, we anticipate receiving them no later than thirty days following your receipt of this letter. In this connection your attention is directed to Sections (sic) 210 of the Act, as (sic) copy of which is enclosed.

**17.** We note that this is not a case where the defendant has alleged arbitrary and discriminatory enforcement on the part of the government. Defendant's claim is based solely on the communication by a government employee. Our analysis would be different if defendant had proffered evidence of a discriminatory pattern of enforcement or an agency abuse of discretion in violation of a Congressional

statement by an employee of a government agency contrary to applicable law cannot operate to bar a correct interpretation of the law except in the most egregious circumstances. *See e.g. Leimbach v. Califano; Simon v. Califano,* 593 F.2d 121 (9th Cir. 1979); *Goldberg v. Weinberger,* 546 F.2d 477 (2d Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977).

Here we find no harm to the defendant resulting from the letter. Defendant has admitted that there is a legal duty to report instances of persuader activity. Yet it argues now that it was prejudiced by the government's action because it filed a report that was restricted to persuader activity.[18] We find no such prejudice. The letter did not hinder defendant in its ability to respond and litigate the scope of the reporting requirements of the Act, nor did it disclose any material other than that to which the government is entitled. This might be a different case were the Secretary seeking sanctions against the defendant for its failure to file prior to the corrected notification sent by the Department.[19] As it stands now, the only consequence of the June 8, 1978 communication is that the Association filed the required reports for its persuader clients. It did not, nor has it to this day, filed the required reports for its "advice only" clients. In these circumstances there is no justification for estopping the government from seeking a proper interpretation of the Act and effectuating what Congress believed to be the public interest.

For the foregoing reasons the Secretary of Labor's motion for summary judgment is granted and the Master Printers Association's motion for summary judgment is denied. Defendant is ordered to comply with the Secretary's request to produce the required LM–21 form within 30 days.

---

scheme. *See e.g. Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**18.** The evidence presented by defendant shows that it waited one full year before producing the reports requested in the June 9, 1980 letter quoted in note 16. We have examined the forms filed and note that they are one page in length and hardly appear that they would require twelve months to complete. In light of defendant's year long delay in submitting the reports it agreed to send, we hardly think defendant is in a position to appeal to our notion of "equity" and argue the "bad faith" of the government. See Defendant's Exhibits A–C.

**19.** In contrast to the defendant's delay, the Secretary notified MPA by letter of the need to supplement its report on July 29, 1981, about six weeks after the incomplete reports were filed. To our knowledge, no action, other than this suit to compel compliance with the statute, has been taken against defendant.