751 F.2d 700
 118 L.R.R.M. (BNA) 2049, 53 USLW 2336,
102 Lab.Cas. P 11,280
 MASTER PRINTERS OF AMERICA, Appellant,
v.
Raymond J. DONOVAN, Secretary of Labor, Appellee.
The Center on National Labor Policy, Inc., Amicus Curiae.
Chamber of Commerce of the United States, Amicus Curiae.
 No. 82-1990.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 8, 1984.
Decided Dec. 26, 1984.
 
 Francis T. Coleman, Washington, D.C. (Elizabeth L. Lewis, Boothe, Pritchard & Dudley, Alexandria, Va., on brief), for appellant.
 Michael Ernest Avakian, North Springfield, Va. (Jeanette P. Papillo, Rockville, Md., The Center on Nat. Labor Policy, Inc., on brief), for amicus curiae in support of appellant.
 Allen H. Feldman, Washington, D.C. (Francis X. Lilly, Deputy Sol. of Labor, Karen I. Ward, Associate Sol. for Special Appellate and Supreme Court Litigation, Charles I. Hadden, Counsel for Appellate Litigation, Elaine D. Kaplan, Dept. of Labor, Washington, D.C., on brief), for appellee.
 Cynthia Wicker, Stephen A. Bokat, Nat. Chamber Litigation Center, Inc., Washington, D.C., on brief, for amicus curiae the Chamber of Commerce of the U.S.
 Before RUSSELL and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 ERVIN, Circuit Judge:
 
 
 1
 Master Printers of America (MPA) (Association) is a national trade association that serves approximately 5,000 non-union commercial printing companies around the country. In 1978 MPA filed suit in federal district court challenging the authority of the Secretary of Labor to require the Association to file reports under Section 203(b) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. Sec. 433(b) (1976) (LMRDA) (the Act) (the Statute). The Secretary responded by seeking an injunction to compel compliance. The suits were consolidated in the form of cross motions for summary judgment and the lower court granted the Secretary's motion. On appeal this court reversed, concluding that an unresolved factual dispute existed over whether MPA's activities fell within the scope of Sec. 203(b). Following a trial, the district court ruled on remand that MPA's activities were covered by the Act.
 
 
 2
 MPA appeals for a second time, arguing that the district court's findings were erroneous and that Sec. 203(b) was unconstitutional because it violated MPA's first amendment rights. We affirmed the lower court's factual findings, but remanded for an initial determination of the constitutional questions. On remand for the second time, the district court concluded that Sec. 203(b) was constitutional. MPA now appeals that decision. We affirm.
 
 I.
 
 3
 MPA's membership consists of approximately 5,000 employers who employ about 200,000 employees. Local associations recruit new members, who then become automatically affiliated with MPA, and arrange for participation in various MPA programs. One such project is MPA's Craftmanship Program, initiated in 1950 to recognize and reward employee excellence through awards of Craftsmanship certificates to experienced workers nominated by their employers and positively evaluated by an expert panel. Roughly one-fifth of the MPA membership (900 employers) participates in this program; there are currently about 12,000 certified Craftsmen.
 
 
 4
 Craftsmen receive a permanent free subscription to the MPA-edited magazine, "Insight," a quarterly some 14-16 pages in length featuring items of general interest to the printing industry. "Insight" goes directly to employees' homes, at addresses furnished by their employers. In a pamphlet for employers entitled "How MPA Serves You," the subjects of "Insight" are said to encompass "technological improvements ..., trends of products or processes, profit facts, advantages of the open shop, human-interest stories, awards events, and similar articles." Among its other publications MPA produces some documents, distributed to employers and employees, with strong anti-union focus.
 
 
 5
 Section 203(b) of the Act requires any person who enters an agreement with an employer to engage in union or open shop "persuader activity" to disclose the arrangement by filing appropriate forms with the Secretary of Labor.[1] When we remanded this case for the first time, the district court concluded that MPA and the employer-participants in the Craftsmanship Program had entered into a persuader agreement that subjected MPA to the reporting requirements of the Act. The court found that the persuader articles appearing in "Insight" were "unabashedly anti-union," and rejected as incredible "the employers' asserted lack of awareness and lack of concern about the content of a publication which they know goes directly to their employees' homes at the employer's direction."
 
 
 6
 On the second appeal MPA did not limit its challenge to the validity of these findings. Rather, the association charged that the statutory reference to persuader activity in the Act was unconstitutionally vague; the registration requirement amounted to content-based prior restraint; the disclosure requirements infringed MPA's freedom of association; and Section 203(b) had been improperly applied to the Association's pure speech. Following our decision to remand for a second time MPA refined its constitutional claims and presented new evidence to support those claims.
 
 
 7
 The Association presented essentially three arguments to the district court. First, it contended that the Act infringed its first amendment rights of speech and association by creating "a substantial deterrent effect on continued MPA membership by numerous employers." MPA offered evidence that in recent years union leaders had depicted the trade association as a "union busting organization." Forced disclosure of membership and contribution lists, MPA contended, would deter current members from participating in MPA programs, jeopardize efforts to recruit additional members, and thereby unconstitutionally burden its speech activity. Second, MPA argued that the Statute was void for vagueness. An "Insight" columnist, Mr. Doesburg, testified that since the outset of the lawsuit he had avoided writing any articles dealing with labor-management disputes because he could not determine what constituted "persuasion" under Sec. 203(b). In MPA's view, therefore, the Act violated its due process rights because it failed "to provide explicit standards" for those applying the disclosure provisions. Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972), quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). Moreover, the ambiguity of the statutory language, according to MPA, had a chilling effect on the Association's freedom of speech, insofar as it forced "Insight" to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." Id. Third and finally, MPA argued that the reporting requirements of Sec. 203(b) constituted a prior restraint on free speech because they required compliance "prior to publication, regardless of the timing or actual contents of the magazine."
 
 
 8
 After reviewing the evidence the district court concluded that MPA had failed to establish a violation of its first amendment rights. The court found that the Act was sufficiently precise to serve notice of its requirements and that any "chilling effect" suffered by Doesburg and MPA was "more an admission that he [and "Insight"] is unable to write an article that is merely informative ... without at the same time taking a position in which he undertakes to persuade his readers." The court viewed with "skepticism" the claim advanced by MPA's witnesses that disclosure would have a "deterrent effect" on membership, but it concluded that even if the disclosure requirements did encroach on MPA's first amendment rights of speech or association, the governmental interests served by the Act far outweighed the harm suffered.
 
 
 9
 The court rejected out of hand MPA's prior restraint argument.
 
 II.
 
 10
 The Supreme Court has recognized that "compelled disclosure of affiliation with groups engaged in advocacy" may infringe first amendment rights. Buckley v. Valeo, 424 U.S. 1, 65-66, 96 S.Ct. 612, 656-657, 46 L.Ed.2d 659 (1976); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). See also Marshall v. Stevens People & Friends, for Freedom, 669 F.2d 171, 176 (4th Cir.1981), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982). Disclosure laws that "significant[ly] encroach" on first amendment rights "cannot be justified by a mere showing of some legitimate governmental interest." Buckley, 424 U.S. at 64-65, 96 S.Ct. at 656-657. Rather, the state's interests must survive "exacting" scrutiny, and the state must establish a "relevant correlation" or "substantial relation" between the governmental interest and the information sought through disclosure. Id. Exacting scrutiny is required even if the infringement on first amendment rights arises "not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." Id.
 
 
 11
 To assess the Association's first claim that the LMRDA's disclosure requirements violate the first amendment rights of speech and association, therefore, our analysis must focus on four factors: the degree of infringement on first amendment rights; the importance of the governmental interest protected by the Act; whether a "substantial relation" exists between the governmental interest and the information required to be disclosed; and the closeness of the "fit" between the Act and the governmental interest it purports to further. After weighing these factors, it will be possible to determine whether the burden imposed on MPA's freedoms of speech and association--if such a burden exists--is sufficiently justified by the interests the Act seeks to protect.
 
 A.
 
 12
 A finding of a substantial "chill" on protected first amendment rights requires a showing that the statutory scheme will result in threats, harassment, or reprisals to specific individuals. Buckley, 424 U.S. at 74, 96 S.Ct. at 661; NAACP, at 357 U.S. at 462-63, 78 S.Ct. at 1171-72 (1958). In NAACP v. Alabama, for example, the Court refused to grant the state's request for disclosure of an NAACP membership list because the NAACP had made an "uncontroverted showing that on past occasions revelation of the identity of its rank and file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." Given this record the Court concluded that compelled disclosure was likely to "affect adversely the ability of petitioner [NAACP] and its members to ... foster their beliefs ... in that it may induce members to withdraw from the Association ... or dissuade others from joining." 357 U.S. at 462-63, 78 S.Ct. at 1171-72. Similarly, in Buckley the court refused to hold that disclosure provisions of the Federal Election Campaign Act, 2 U.S.C. Sec. 431 (1976), violated first amendment rights of minor parties and independent candidates because "no appellant in this case has tendered record evidence of the sort proffered in [NAACP v.] Alabama." 424 U.S. at 71, 96 S.Ct. at 659.[2] Although the Court stated that "the evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals," the Court also made clear that "[w]here it exists the type of chill and harassment identified in [NAACP v.] Alabama can be shown." Id. at 74, 96 S.Ct. at 661.
 
 
 13
 We do not believe that the evidence and allegations of first amendment infringement here constitute the sort of threat of physical harm and loss of employment found in NAACP v. Alabama and its progeny. MPA offered testimony indicating that disclosure would enable printing industry competitors to gain unfair advantage over MPA members and would "cause the added annoyance of harassment" by unwanted solicitors, but this evidence was entirely speculative. MPA also offered testimony that where membership has been publicized, employers have discontinued their contributions to MPA's voluntary action program and "have considered withdrawing completely from MPA." This testimony, however, was not based on a careful documentation of MPA's recent membership statistics, but rather rested on a casual reference by MPA's general counsel:
 
 
 14
 Q: In your opinion would the disclosure of those contributions, voluntary contributions, by individual MPA members to that have any effect on the continuation of those contributions?
 
 
 15
 A: It already has. We have several cases in which the unions have come out and publicized to certain employees in an organization campaign amounts which were given to the Voluntary Action Program or paid into MPA, and as a result they were exaggerated. The company answered those results--answered those accusations, but discontinued any further payments in the Voluntary Action Program.
 
 
 16
 (J.A. 83)
 
 
 17
 The skepticism with which we view this evidence of encroachment on MPA's first amendment rights is supported by several facts pointed out by the district court. First, knowledgeable persons in the industry already know which shops are unionized and which are not. Second, it is unlikely that competitors could derive useful information from knowing the amount of dues an employer pays to MPA. Finally, MPA itself concedes that the affiliation of employers who participate in the Craftsmanship Program is already known to their employees. Thus it is difficult to take seriously MPA's fears that disclosure will force a decline in membership.[3]
 
 
 18
 We conclude, therefore, that Sec. 203(b)'s disclosure and reporting requirements do not substantially burden MPA's rights of speech and association. Although we do not foreclose the possibility that on different facts the Act might create a substantial chill on a given organization's first amendment rights, we do not believe that MPA has established the type of record evidence[4] of encroachment required to establish a "deterrent effect" under Buckley and NAACP v. Alabama.
 
 B.
 
 19
 Our conclusion that the district court did not clearly err in finding that MPA failed to establish a substantial burden on its first amendment rights is not the end of the inquiry. The allegations of chill here, while they are not substantial, are also not entirely inconsequential. A serious claim of infringement has been made. To survive the "exacting scrutiny" required by the Supreme Court, therefore, the government must show that the disclosure and reporting requirements are justified by a compelling government interest, and that the legislation is narrowly tailored to serve that interest.[5] It is to these considerations that we now turn.i
 
 
 20
 The Supreme Court has "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." Buckley, 424 U.S. at 66, 96 S.Ct. at 657, quoting Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 97, 81 S.Ct. 1357, 1411, 6 L.Ed.2d 625 (1961). Among the interests recognized by the Court as compelling are the "deterrence of actual corruption," 424 U.S. at 67, 96 S.Ct. at 657, and "the government's power to inform itself through investigations 'in order to act and protect its legitimate and vital interests.' " Marshall, 669 F.2d at 178 quoting Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 544, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963).
 
 
 21
 The legislative history and purpose behind the enactment of the LMRDA has been exhaustively reviewed by this Court in Marshall v. Stevens People & Friends, for Freedom, 669 F.2d 171 (4th Cir.1981), and by the Seventh Circuit in Donovan, 699 F.2d 370 (affirming and adopting the opinion of the district court, 532 F.Supp. 1140 (N.D.Ill.) (1983). In Marshall we noted that the need for compelled disclosure under the Act grew out of Congressional findings that "union busting" management middlemen were working with employers to undermine employee efforts to exercise their Sec. 7 rights.[6] The Senate committee conducting the investigation concluded that
 
 
 22
 [F]rom recent investigations in the labor and management fields [we conclude] that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives.
 
 
 23
 [T]he enactment of this chapter [Sec. 203(b) ] is necessary to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act....
 
 
 24
 29 U.S.C. Secs. 401(b), 401(c) (declaration of findings, purposes, and policy).
 
 
 25
 Recognizing the corruption and bribery that these middlemen had been involved in,[7] and recognizing as well that the "persuader business" boded ill for an area of law that was already "pervasively regulated" to prevent a return to the "economic warfare of the nineteenth century," Donovan, 532 F.Supp. at 1148; Price v. Wirtz, 412 F.2d 647 at 650 (5th Cir.1969), the Senate Committee recommended a comprehensive disclosure law:
 
 
 26
 The committee believes that employers should be required to report their arrangements with these union-busting middlemen. Further, the Committee on Labor and Public Welfare has received evidence in prior hearings showing that large sums of money are spent in organized campaigns on behalf of some employers for the purpose of interfering with the right of employees to join or not to join a labor organization of their choice, a right guaranteed by the National Labor Relations Act. Sometimes these expenditures are hidden behind committees or fronts; however the expenditures are made, they are usually surreptitious because of the unethical content of the message itself....
 
 
 27
 Similarly, expenditures have been made in the past by employers surreptitiously and through labor spies, to obtain information about employees and unions. This type of activity certainly is not conducive to sound and harmonious labor relations.
 
 
 28
 Senate Committee on Labor and Public Welfare, S.Rep. No. 86-187, 86th Cong., 1st Sess. (1959), reprinted in [1959] U.S.Code Cong. & Admin.News 2318, 2326-2327. The committee reasoned that even if all of the activity engaged in by management middlemen was not illegal, compelled disclosure would have a much needed remedial effect:
 
 
 29
 All of the activities required to be reported by this section are not illegal nor are they unfair labor practices. However, since most of them are disruptive of harmonious labor relations and fall into a gray area, the committee believes that if an employer or a consultant indulges in them, they should be reported.
 
 
 30
 S.Rep. at 2328.
 
 
 31
 It is clear from the Act's legislative history, therefore, that Sec. 203 was enacted for the purpose of serving the twin "compelling" governmental interests of deterring actual corruption and bolstering its own ability to investigate "in order to act and protect." Gibson, 372 U.S. at 544, 83 S.Ct. at 892.[8] Thus, if in fact MPA has suffered a minimal infringement on its first amendment rights, that infringement is the consequence of government efforts to protect legitimate and important societal interests.
 
 
 32
 ii
 
 
 33
 The governmental interests identified by Congress and enacted by the Secretary are unquestionably "substantially related" to the disclosure scheme embodied in Sec. 203. As a general matter, the Supreme Court has recognized that disclosure is an effective means of countering actual corruption and the appearance of corruption:
 
 
 34
 Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light is the most efficient policeman.
 
 
 35
 Buckley, 424 U.S. at 67, 96 S.Ct. at 657, quoting L. Brandeis, Other People's Money 72 (1933). The disclosure requirements of Sec. 203 provide much needed "sunlight" in several ways. First, disclosure helps employees, "like voters in an election," to understand the source of the information that is distributed. Donovan, 532 F.Supp. at 1150. This type of exposure discourages potential abuse and dramatically reduces the appearance of impropriety in an area where there has been a demonstrated propensity for wrongdoing. Second, as the district court in Donovan noted, the LMRDA scheme ensures that the Secretary has the means to gather data and detect violations:
 
 
 36
 The annual report serves as a cross-check on the accuracy of the 30 day reports and serves to notify the Secretary of relationships between a persuader and employer which may give rise to a duty to file a 30 day report.
 
 
 37
 Donovan, 532 F.Supp. at 1150.
 
 
 38
 iii
 
 
 39
 MPA insists that even if compelling government interests exist that are substantially related to the information required to be disclosed, the Act is not carefully tailored to achieve its purpose. According to MPA, employees who receive "Insight" know it is an MPA publication and appreciate the nature of MPA. Nothing is gained, therefore, by requiring the additional burden of comprehensive financial disclosure. In addition, MPA points out that although over 5,000 employers could be affected by Sec. 203, only 900 companies were actually participating in the Craftsmanship Program at the time disclosure in this case was sought.
 
 
 40
 We find these arguments unpersuasive. In enacting the LMRDA, Congress foresaw that only extensive, detailed exposure of covert management activities would limit abuses by middlemen. Reviewing the purposes behind the LMRDA in Wirtz v. Fowler, 372 F.2d 315 (1966), the Fifth Circuit made this point effectively:
 
 
 41
 "This exposure [e.g. disclosure] was to include not only the fact that the consultant was paid by management, but why he was paid, how much he was paid, and the practices he engaged in to earn his pay. The aim was disclosure, but the method almost uniformly adopted to attain the end was reporting of these details, not the mere verbal acknowledgement by the consultant that he was hired by management as a persuader, a fact few employees would be too insensitive to grasp."
 
 
 42
 Wirtz, 372 F.2d at 325.[9] It is difficult to imagine how the Act could be effective if it required only disclosure of identity and not disclosure of financial information. Full financial disclosure, in our view, therefore, is not overkill; to the contrary, it is absolutely essential if the purposes behind the Act are to be fulfilled.
 
 
 43
 Similarly, we find little significance in the fact that the number of employers potentially affected by the disclosure requirement exceeded the number of companies enrolled in the Craftsmanship Program at the time compliance was sought. Congress believed management persuaders as a group were inherently suspect. In order to deter both actual corruption and the appearance of corruption, Congress concluded that it would be necessary to require the disclosure of a wide-ranging number of employers and activities, even if it meant reporting activities that were not improper. S.Rep. 187, 86th Cong., 1st Sess. at 10, reprinted in [1959] U.S.Code & Admin.News 2318, 2328 (1959). Clearly, those who participate in the Craftsmanship Program may be more likely to have conspired with MPA to persuade than those only tangentially involved in the "persuader business," but that is not a reason to restrict arbitrarily the scope of the disclosure "spotlight." Indeed, if anything, the need for wide-ranging disclosure may be even more critical in the labor context because of the difficulty of distinguishing between persuader and nonpersuader activities. See Price v. Wirtz, 412 F.2d 647, 650 (5th Cir.1969).[10]
 
 
 44
 In contrast to the position taken by MPA, we are impressed by the precision with which Sec. 203(b) has been tailored to serve its purpose. The annual report, which deals with the less sensitive area of labor relations advice or services, does not require full disclosure of MPA's financial structure or of the content of the advice rendered. Only those receipts and disbursements specifically related to labor relations advice or services need be reported. Nor does Sec. 203(b) require MPA to designate which employers named in the annual report are members and which are not. In the suspect area of actual persuasion, however, the Statute employs the 30 day report to ensure a more detailed and immediate disclosure. With each type of report the Statute requires only the information necessary to inform employees and the Secretary of the consultant's labor relations activities. In this way an individual or organization need provide no more than is absolutely necessary to further the twin goals of deterring corruption and permitting the government to "inform itself through investigations 'in order to act and protect its legitimate and vital interests'." Marshall, 669 F.2d at 178, quoting Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 544, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963).
 
 
 45
 Our conclusion that Sec. 203(b) is not overbroad is strongly supported by Buckley, for as the district court in Donovan pointed out, the LMRDA's disclosure scheme is "remarkably similar" to parts of the Federal Election Campaign Act that were held constitutional by the Buckley Court. Both statutes recognize that although most persuader activity or campaign contributions have no corrupting influence on labor relations or the political process respectively, rigorous and comprehensive reporting and record keeping requirements are necessary to combat the appearance of corruption. Thus both statutes impose a variety of requirements on virtually all types of campaign contributions and persuader activity respectively.
 
 
 46
 Likewise, both statutory schemes implicitly recognize that if voters in an election or employees in a labor setting are to have some knowledge of where the information in a political or union election comes from, and if agencies charged with enforcement are to possess the means to detect violations of the FECA and LMRDA respectively, comprehensive disclosure requirements are essential. Thus both schemes require complete disclosure in the belief that "goldfish-bowl publicity", 412 F.2d at 650, will aid the government in "curbing the evils of [public] ignorance and corruption." 424 U.S. at 68, 96 S.Ct. at 658.[11]
 
 
 47
 Finally, it is important to note that courts have been loathe to hold disclosure requirements overbroad with the same degree of frequency reserved for other laws that seek to restrict particular types of speech. Disclosure laws perform the important function of deterring actual corruption and avoiding the appearance of corruption, but unlike other types of restrictive laws they actually promote speech by making more information available to the public and thereby bolstering the "marketplace of ideas." See First National Bank of Boston v. Bellotti, 435 U.S. 765, 791-92 at n. 2, 98 S.Ct. 1407, 1423-24 at n. 2, 55 L.Ed.2d 707 (1978); Kania v. Fordham, 702 F.2d 475 (4th Cir.1983).[12]
 
 III.
 
 48
 We now turn to MPA's second major contention that Sec. 203(b) is impermissibly vague.
 
 
 49
 Vague laws may be found unconstitutional either because they violate basic principles of due process or because they impermissibly limit free speech. Due process may be offended in one of two ways:
 
 
 50
 First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.
 
 
 51
 Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (footnotes omitted). Free speech, in turn, may be offended if the uncertainty of the meaning of the statute causes a citizen to "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." Grayned, 408 U.S. at 109, 92 S.Ct. at 2299, quoting Speiser v. Randall, 357 U.S. at 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958).
 
 
 52
 Here MPA argues that the vagueness of the term "persuade", as used in Sec. 203(b), violates both its due process and first amendment rights. According to MPA, the statute does not make clear whether Sec. 203(b) requires disclosure only if the merits of a particular union organizing campaign are discussed in an "Insight" article which is sent to employees involved in that particular campaign, or if disclosure is also required should "Insight" authors undertake to write about an organizing dispute in nonspecific terms. In MPA's view, the ambiguity of the statute violates due process because it is impossible for the Association to anticipate whether the distribution of "Insight" to employer members will be reportable. This "vagueness" also violates the Association's first amendment rights because, as MPA puts it, "Insight" writers have been forced to "steer far wider of the unlawful zone" than if the applicability of the statute had been clearly defined. MPA insists that the ambiguity has caused "Insight" writers to engage in "self-censorship" or "refrain [entirely] from publishing articles which deal in any way with unions", even though some of the planned articles "would undoubtedly have fallen within the area of protected speech." 408 U.S. at 109, 92 S.Ct. at 2299.
 
 
 53
 We are not convinced that Sec. 203(b), as written, is impermissibly vague. A statute is not vague if "it conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). The term "persuade" meets this standard. As the district court found, "persuade is a common every day word--easily capable of being understood. Webster's New Collegiate Dictionary defines persuade as meaning "to move by argument, entreaty, or expostulation to a belief, position, or course of action." We find nothing ambiguous or confusing about this definition. Indeed, in Douglas v. Wirtz, 353 F.2d 30 (4th Cir.1965), cert. denied, 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665 (1966), we noted that the term "persuade" is commonly--and properly--used in many situations where reports are required by law. Wirtz, 353 F.2d at 33-34. See generally NLRB v. Gissel Packing, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969) (not unconstitutional or unreasonable to require an employer to distinguish among types of persuasive speech).
 
 
 54
 The context in which the term is placed in the Statute is equally clear. Persuasion will trigger disclosure if it is made "pursuant to any agreement or arrangement with an employer"; if it is aimed at an employee; and if the subject of the persuasion is the exercise of an employee's right to organize or bargain collectively. By the plain terms of the Statute "persuasion" can potentially be communicated through publication of an article discussing organizing on a theoretical level, or an article discussing the specifics of a particular organizing campaign. What matters is not the precise union dispute that is discussed, but rather whether the article is distributed pursuant to an agreement with an employer, and whether it is published with the intention to persuade employees about the merits of union organizing and collective bargaining.
 
 
 55
 MPA was well aware that it had entered into specific agreements with various employers to distribute "Insight" magazine. We find preposterous the suggestion made by MPA that its relationship to the employer-employee recipients of "Insight" is no different than that enjoyed by the Wall Street Journal, Readers Digest, and U.S. News and World Report. Clearly the Association remains on notice that any articles designed to "persuade" employees one way or the other about open-shop arrangements will trigger disclosure, regardless of whether the persuader activity involves specific or theoretical organizing efforts, and regardless of whether the particular shop that received the material is the subject of the persuader material.[13]
 
 
 56
 When MPA's vagueness argument is stripped to its essentials, it becomes nothing more than an admission that, in the words of the district court, "Insights' " authors are "unable to write an article that is merely informative ... as to conditions and technical advances in the industry, without at the same time taking a position in which [they] undertak[e] to persuade [their] readers." Given MPA's track record as an "unabashedly anti-union" trade association, we find it rather disingenuous for it to argue seriously that it is unable to distinguish speech designed to persuade from speech that is merely informational. As the district court so aptly put it:
 
 
 57
 It may well be that an article containing [MPA's] point of view, written in a persuasive manner or factual information in the context of supporting that point of view, is more interesting than pure uneditorialized facts. But that [MPA's inability to distinguish the two] is not a problem of constitutional dimension.[14]
 
 IV.
 
 58
 Finally, MPA argues that the 30 day reporting requirements constitute an impermissible "prior restraint" on free speech. The district court held that the "persuader agreement" occurs when MPA's members join the Craftsmanship program. Because a report must be filed under Sec. 203(b) by MPA within 30 days after the member has joined the Craftsmanship program, and because this filing may be required before "Insight" is actually published, in certain circumstances MPA may in fact be required to comply with the reporting requirements "even when 'Insight' turns out to be totally innocuous." Appellant's brief at 18. In MPA's view, therefore, requiring the Association to determine in advance of a publication date whether to make "burdensome financial disclosure" amounts to a prior restraint. Id.
 
 
 59
 We find no merit in this argument. As a general matter, prior restraints have only been held to exist where there is a direct restraint on speech. Commonly that restraint takes the form of a court order enjoining speech activity. See Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).[15] This case simply does not involve a direct restraint. The Secretary does not seek to enjoin speech activity, but rather merely seeks disclosure. MPA remains free to distribute whatever it wants, provided it complies with the reporting and disclosure requirements.
 
 
 60
 The Supreme Court has never analyzed a disclosure law that may require persons to file reports before engaging in speech as a prior restraint. The Federal Election Campaign Act, for example, upheld in Buckley, requires committees and candidates to file reports of contributions received in excess of $1000 within 10 days of the calendar quarter in which the contributions are accepted. 2 U.S.C. Sec. 434(a). The Act also imposes certain time limits for independent expenditures made after the fifteenth day before the election. 2 U.S.C. Sec. 434(e). The filings must be made before the candidate or committee engages in "speech" activity. The Buckley court held that the burdens imposed by these provisions, specifically Sec. 434(e), were "no prior restraint, but a reasonable and minimally restrictive method of furthering first amendment values by opening the basic processes of our federal election system to public view." Buckley, 424 U.S. at 82, 96 S.Ct. at 664. Similarly, in United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), the Supreme Court upheld the Federal Regulation of the Lobbying Act, 2 U.S.C. Secs. 261 et seq., which requires lobbyists (as defined in the Statute) to register and make disclosure "before doing anything in furtherance of this object." 347 U.S. at 616, n. 2, 74 S.Ct. at 811, n. 2. Clearly by the plain language of its opinion the Court refused to view the disclosure requirements as a prior restraint. We find nothing in the provisions of the LMRDA that leads this court to conclude that the disclosure provisions at issue here should be subjected to any different analysis than that employed by the Supreme Court in Harriss and Buckley.
 
 V.
 
 61
 The LMRDA was not conceived in haste. It represents a carefully considered and crafted legislative response to chronic and serious problems that have persistently plagued union-management relations and threatened the chances for industrial peace. The disclosure and reporting requirements of Sec. 203(b) are an integral part of that effort to promote harmonious labor relations. Designed to deter corruption in an area that Congress concluded was "inherently suspect" and "subject to abuse," these provisions are remarkably similar to other disclosure and reporting schemes upheld by the Supreme Court in related contexts. Just as the Federal Elections Campaign Act reviewed in Buckley and the Lobbying Act upheld in Harriss provided such needed sunlight in two areas prone to corrupt activity, so the disclosure provisions of the LMRDA expose "persuader activity" to the effective "disinfectant" of public scrutiny. Buckley, 424 U.S. at 67, 96 S.Ct. at 657, quoting L. Brandeis, Other People's Money 72 (1933).
 
 
 62
 Section 203(b) achieves its goal of disclosure in a manner that does not unconstitutionally burden first amendment rights of speech and association. When the four factors of the Buckley balancing test are carefully weighed, it is clear that the government's interests in the Statute are compelling, the degree of infringement is minimal, the purpose of the Statute is substantially related to its requirements, and the level of disclosure required is carefully tailored to the goals of the Statute.
 
 
 63
 Likewise, Sec. 203(b) defines the conduct that will trigger the disclosure and reporting requirements with sufficient precision to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and when triggered the Statute does not impose a direct restraint on speech. Thus the Statute achieves its purpose without denying to MPA due process and first amendment rights protected under the vagueness doctrine, and without imposing a prior restraint on MPA's protected speech.
 
 
 64
 For these reasons the judgment of the district court is
 
 
 65
 AFFIRMED.
 
 
 
 [1]
 Section 203(b) of the Labor-Management Reporting and Disclosure Act states in full that:
 Every person who pursuant to any agreement with an employer undertakes activities where an object thereof is, directly or indirectly--
 (1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; or
 (2) to supply an employer with information concerning the activities of employees or a labor organization in connection with a labor dispute involving such employer, except information for use solely in conjunction with an administrative or arbitral proceeding or a criminal or civil judicial proceeding;
 shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.
 
 
 [2]
 MPA relies heavily on Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir.1980), as an example of a disclosure law that was found to infringe on associational rights because of the chilling effect that disclosure would have on petitioner organization's membership. Yet, like NAACP, the court found specific record evidence of reprisals by both private citizens and public officials against members of the organization. Id. at 395-96, 399. The court was not content to rely on mere speculation about a potential decline in membership
 
 
 [3]
 Our review of the findings made by the district court, of course, is subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a). Even were we to disagree with the district court's ultimate conclusion about the alleged "deterrent effect" of the disclosure provisions, we do not believe that the record offers sufficient evidence of actual harm to permit reversal under Rule 52
 
 
 [4]
 MPA stresses Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir.1980) to support its claim of infringement on speech activity. In our view Familias Unidas is wholly distinguishable from this case. There the district court found specific record evidence of reprisals against members of the plaintiff organization by private citizens and public officials. As discussed supra, our case does not involve this type of evidence. Compare NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Buckley v. Valeo, 424 U.S. 1, 64-65, 96 S.Ct. 612, 656-657, 46 L.Ed.2d 659 (1976) with Federal Election Comm'n v. Hall-Tyner Election Campaign Comm., 678 F.2d 416 (2d Cir.1982), cert. denied, 459 U.S. 1145, 74 L.Ed.2d 992 (1983) (record evidence of harassment); Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (record evidence of reprisals)
 
 
 [5]
 See Buckley, 424 U.S. at 64-66, 96 S.Ct. at 656-657; Marshall v. Stevens People & Friends, for Freedom, 669 F.2d 171, 178 (4th Cir.1981); Donovan v. Master Printers Ass'n, 532 F.Supp. 1140, 1148 n. 11, (N.D.Ill.1981), aff'd, 699 F.2d 370 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984)
 
 
 [6]
 "Section 7 rights" refers to the right to unionize granted to all workers under Section 7 of the National Labor Relations Act, 29 U.S.C. Sec. 157 (1976)
 The LMRDA, as opposed to the NLRA, was the product of lengthy investigations into organized labor conducted by the McClellan Committee. Like its predecessors, the Kennedy-Ives Bill, S. 3974, 85th Cong., 2d Sess. (1958), the Kennedy-Ervin Bill, S. 505, 86th Cong., 2d Sess. (1959), and S. 1555, 86th Cong. 1st Sess. (1959) (written by Senator John F. Kennedy), the LMRDA focused on the manner in which "middlemen" were used by management to limit employee efforts to unionize. See Donovan, 532 F.Supp. at 1150.
 
 
 [7]
 The extent of the wrongdoing uncovered by the Senate Committee was vividly documented in one excerpt from its report:
 The committee notes that in almost every instance of corruption in the labor management field there have been direct or indirect management involvements. The report of the McClellan committee describes management middlemen flitting about the country on behalf of employers to defeat attempts at labor organization. In some cases they work directly on employees or through committees to discourage legitimate organizational drives or set up company-dominated unions. These middlemen have been known to negotiate sweetheart contracts. They have been involved in bribery and corruption as well as unfair labor practices. The middlemen have acted, in fact if not in law, as agents of management. Nevertheless, an attorney for the National Labor Relations Board has testified before the McClellan committee that the present law is not adequate to deal with such activities.
 Senate Committee on Labor and Public Welfare, S.Rep. No. 86-187, 86th Cong., 1st Sess. (1959), reprinted in [1959] U.S.Code Cong. & Admin.News 2318-2327.
 
 
 [8]
 Justice Stewart has recognized a third "compelling" governmental interest where first amendment rights have been challenged in the labor relations context. In Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), Justice Stewart stated in his concurring opinion that limits on employer speech that might violate the first amendment in a purely political setting are permissible in a labor setting because of the government's interest in maintaining "antiseptic conditions in the labor relations context." 425 U.S. at 778-79, 96 S.Ct. at 1833-34
 
 
 [9]
 The Senate Report submitted with an earlier version of the LMRDA--the Kennedy-Ives Bill--stated that the danger of corruption posed by union-busting middlemen was so great that even expenditures made in the open should be disclosed in the same manner as all union financial disbursements:
 "The committee believes that employers should be required to report their arrangements with these union-busting middlemen.
 * * *
 [L]arge sums of money are spent in organized campaigns on behalf of some employers for the purpose of influencing and affecting employees in the exercise of their rights.
 * * *
 Sometimes these expenditures are hidden behind committees or fronts. Sometimes they are made in the open. In any event ... they should be exposed to the light of publicity in the same fashion that all union financial disbursements will be exposed."
 S.Rep. No. 1684, 85th Cong., 2d Sess. 7-8 (1958) (emphasis added).
 
 
 [10]
 In Wirtz the Fifth Circuit noted that:
 The legislative judgment that one who engages in the persuader business must be subjected to the pressure of revealing publicity is amply justified by the difficulty in distinguishing between those activities that are persuader activities and those that are not, and by the opportunity for misleading concealment of the true nature of such [persuader's] work in situations involving intricate corporate conglomerate associates or, equally pressing, industry wide labor controversies.
 412 F.2d at 650.
 
 
 [11]
 If, as the Buckley Court found, detection of violations is important in the campaign finance context, it is even more important in the labor area where employers may find it easy to use persuaders to commit unfair labor practices that will undercut the employees' right to choose union representatives. A close look at the disclosure scheme upheld in Buckley, then, might justify an even more comprehensive disclosure law in the labor area than the LMRDA presently offers
 
 
 [12]
 To support its overbreadth argument, MPA cites Familias Unidas v. Briscoe, 619 F.2d 391 (5th Cir.1980), as an example of a disclosure statute, allegedly similar to this one, that was found to infringe impermissibly on protected first amendment activity. We have already noted some of the differences between this case and Familias Unidas. See note 4 supra. To those considerations we add the observation that unlike the state statute in Familias Unidas, Sec. 203(b) does not make membership in an organization grounds for disclosure. Rather it hinges disclosure on the existence of a relationship involving the supplying of labor relations advice between a persuader and an employer. Insofar as the purpose of Sec. 203(b) is to focus public attention on all labor relations activities of persuaders, the reporting and disclosure provisions at issue here are more carefully tailored to the purposes of the underlying statute than those involved in Familias Unidas
 
 
 [13]
 The district court made this point somewhat differently, but in our opinion, no less accurately when it took the position that as long as an agreement with a specific employer exists, persuader activity should be considered directed at the recipient employees even if the subject of the writing is a general anti-union discussion. In the district court's view, Sec. 203(b) does not need the further limiting construction sought by MPA, for it is already specific enough in its application to specific employees:
 MPA argues under Buckley that the definition of "persuade" should be limited "to activities directed towards a particular company's employer or to a specific union organizing campaign." Under Sec. 203(b), however, the term "persuade" is used only in connection with one who has entered into an "agreement" with an employer. Admittedly, "Insight" acts to "persuade" employees of the member employer under Sec. 203(b) by publishing anti-union articles perhaps having another employer or union, or labor-management relations in general, as its subject matter. Nevertheless, MPA's having made an agreement with the member employer makes the publication's persuasive articles applicable to that specific employer and his employees. As far as adequately informing the plaintiff of its strictures, the statute meets any constitutional requirement.
 (J.A. at 10). Implicit in the district court's position is the same conclusion reached by this Court: namely, that if the term "persuade" is clear standing on its own, the use of that term in the context of the statute does not give MPA a valid claim under the vagueness doctrine.
 
 
 [14]
 MPA relies on Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1944), to argue that the term "persuade" is no more specific than the term "solicit" which was found "impermissibly vague" by the Supreme Court in Collins. In Collins the State of Texas imposed a restraining order on a union organizer to prevent him from speaking to potential union members because he had not obtained a registration card. The relevant Texas statute required "[a]ll labor union organizers ... to file with the Secretary of State, before soliciting any members for his organization, a written request ... for an organizer's card...." The Supreme Court held that because it would have been impossible for Thomas to give a speech advocating the union's cause without "lauding unionism" and thereby "inviting" or "soliciting" membership, the statute had the effect of restricting the content of Thomas' speech
 Collins is distinguishable from this case in several respects. First, the term solicit, as used in the Texas statute, had many plausible meanings, some of which overlapped with protected speech:
 A speaker in such circumstances could avoid the words "solicit", "invite", "join". It would be impossible to avoid the idea .... How one might "laud unionism", as the State and the State Supreme Court concede Thomas was free to do, yet in these circumstances not imply an invitation, is hard to conceive. This is the nub of the case.... The feat would be incredible for a national leader, addressing such a meeting lauding unions and their principles, urging adherence to union philosophy, not also and thereby to suggest attachment to the union by becoming a member.
 Thomas, 323 U.S. at 534-35, 65 S.Ct. at 324-25. "Persuade", as defined in Sec. 203(b), is far more precise. "Persuader activity" only triggers the statute if it takes place pursuant to an agreement with an employer, addresses itself to the subject of employee organizing rights and collective bargaining, and is directed at employees of an employer. In our view, the key term of Sec. 203 is as carefully delineated, defined, and articulated as one could reasonably expect within a statutory framework. There is simply no comparison to the ambiguity surrounding the term "solicit" in the Texas statute.
 Second, and more important, the consequence of triggering the Texas statute was to enjoin all speech: "The threat of the restraining order, backed by the power of contempt, and of arrest for crime, hung over every word." Id. at 534, 65 S.Ct. at 324. A finding of "persuader activity" in the LMRDA context only triggers disclosure requirements. Thus even if protected speech were to trigger the statute, that speech would still be heard. Given the stark choice between an injunction or speech, a heavier burden rested on the drafters of the Texas statute to articulate the compelling government interests at stake and define terms as carefully as possible.
 Indeed, the vast majority of cases where the Supreme Court has found statutes to be impermissibly vague involve situations where the statutory sanctions at issue curtailed all speech, or involve terms so vague as to proscribe inadvertently an extended range of activity. See, e.g., Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (striking down ordinance punishing individuals for conducting "themselves in such a manner annoying to persons passing by ..."); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (striking down ordinance prohibiting one from agitating "to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet."). This clearly is not our case.
 
 
 [15]
 Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), relied on by MPA so heavily in its brief, see note 14 supra, involved this type of restraint