HUMPHREYS, HUTCHESON AND MOSELEY, Plaintiff-Appellant,

v.

Raymond J. DONOVAN, Secretary of Labor, Defendant-Appellee.

No. 83–5564.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 1, 1984.

Decided February 20, 1985.

James V. Doramus, James F. Neal, Neal & Harwell, Nashville, Tenn., Frank P. Pinchak (argued), Chattanooga, Tenn., for plaintiff-appellant.

R. John Seibert, June R. Carbone, Dept. of Justice, Washington, D.C., Joe B. Brown, U.S. Atty., Margaret Huff, Asst. U.S. Atty., Nashville, Tenn., for defendant-appellee.

Before KEITH and CONTIE, Circuit Judges, BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This appeal involves sections 203[1] and 204[2] of Title II of the Labor Management Reporting and Disclosure Act of 1959 (hereinafter referred to as "Act" or "LMRDA").[3] The issue on appeal is whether plaintiff attorneys who made speeches urging their client's employees to vote against union representation (and who were, therefore, "persuaders") were required by section 203(b) of the LMRDA to make the reports described by that provision. When the Secretary called upon plaintiff attorneys to make the reports contemplated by section 203(b), they filed an action for declaratory relief and an injunc-

---

**1.** 29 U.S.C. § 433.

**2.** 29 U.S.C. § 434.

**3.** 29 U.S.C. § 401 *et seq.* Section 203 provides in pertinent part:

(b) Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly—

(1) to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing; ... shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services, designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.

**1214**

tion, and the Secretary filed a counterclaim for an order requiring the attorneys to make the reports. In an extensive and careful opinion, *Humphreys, Hutcheson & Moseley v. Donovan*, 568 F.Supp. 161 (M.D. Tenn.1983), the district court held that the plaintiff attorneys must comply with all of the disclosure requirements of section 203 and granted summary judgment for the Secretary.

### I.

The facts in this case are undisputed. Humphreys, Hutcheson and Moseley ("HH & M") is a law firm that practices labor law in Chattanooga, Tennessee. In 1977, HH & M was retained by Southern Silk Mills, Inc. to represent it during an election conducted by the NLRB. Before the election, two of the firm's partners, William P. Hutcheson and Ray H. Moseley, made speeches to Southern Silk's employees urging them to reject representation by the Amalgamated Clothing and Textile Workers Union ("Union" or "ACTWU").[4] Before he began his speech, Moseley was identified as an attorney in the law firm representing Southern Silk. In his speech to the workers, Moseley rendered an account of an unlawful strike against Kayser-Roth Corporation involving the same Union.[5] After describing the violence that accompanied the Kayser-Roth strike, Moseley urged the assembled employees to vote against the Union.[6] Hutcheson also described the Kayser-Roth strike violence and exhorted the employees to reject union representation.

On September 7, 1978, the Department of Labor ("Department"), through its Nashville, Tennessee office, contacted HH

& M by mail, stating that it had received an inquiry regarding the firm's persuader activities during the Southern Silk Mills election. The Department informed HH & M that because Mr. Moseley and Mr. Hutcheson had attempted to persuade the employees to reject the Union, the firm must disclose its agreement with Southern Silk pursuant to section 203 of the LMRDA. The Department also instructed HH & M that it must file an annual financial report, Form LM–21, reporting *inter alia* "receipts and disbursements of any kind in connection with labor relations advice and services."

### II.

HH & M contends that the statute properly interpreted does not require it to file the reports contemplated by section 203(b) and that if it does, the statute is unconstitutional. The Secretary, of course, contends the contrary. We approach the issues as did the parties.

### A.

Under LMRDA section 203, a person who agrees to engage or who engages in persuader activities must file a thirty day report and an annual report. The Secretary has authorized the use of Form LM–20 for the thirty day report, 29 C.F.R. § 406.2 (1984), and Form LM–21 for the annual report, 29 C.F.R. § 406.3(a) (1984). The annual report is more comprehensive than the thirty day report. The annual report requires the persuader to disclose all receipts from all employers on account of labor relations advice or services and the persuader must designate the source of these receipts. In addition, the persuader

---

**4.** The speeches were made pursuant to an agreement with Southern Silk Mills.

**5.** *See Kayser-Roth Corp. v. Textile Workers Union of America, AFL–CIO,* 347 F.Supp. 801 (E.D. Tenn.1972), *aff'd,* 479 F.2d 524 (6th Cir.), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).

**6.** He stated, "Which one of you in your hearts would like to be number [sic] in a company of infidels like that?" Appendix at 86. Moseley

described the Union leaders as "nightriders," "great marvelors, courageous cowards from New York," and "a wicked breed of cat." Moseley also attacked the motives of the Union leadership as follows: "the head leadership of the Textile Workers Union are New Yorkers, and their home office is in New York and their assets are in New York ... they don't have any vested interest down here except as a source of taking money out of people's paychecks." Appendix at 77.

must reveal all of his disbursements made in connection with his labor relations advice and services, and the persuader must specify the purpose for these disbursements.

HH & M has stipulated that it has acted as a persuader, yet it contends that the firm should be excused from filing the reports, especially the annual report. HH & M first argues that section 203(b) of the statute is inapplicable to the firm because it did not act as a covert middleman. It is undisputed that the HH & M partners identified themselves as attorneys representing Southern Silk management before speaking to its employees. HH & M contends that the LMRDA is aimed at covert management middlemen who engage in activities such as spying, bribery and influence peddling rather than at persuaders who openly engage in "legitimate" persuasive activities such as the speeches given by the partners of the firm who were disclosed persuaders.

▮ When enacting the LMRDA, Congress did not distinguish between disclosed and undisclosed persuaders or between legitimate and nefarious persuasive activities. Rather, Congress determined that persuasion itself was a suspect activity and concluded that the possible evil could best be remedied through disclosure. It was hoped that persuasive activity would be curbed by subjecting persuaders to glaring publicity. We agree with the summation of congressional intent set forth by the Fifth Circuit in *Price v. Wirtz*, 412 F.2d 647 (5th Cir.1969) (en banc):

> The legislative judgment that one who engages in the persuader business must be subjected to the pressure of revealing publicity is amply justified by the difficulty in distinguishing between those activities that are persuader activities and those that are not, and by the opportuni-

ty for misleading concealment of the true nature of such Attorney's work in situations involving intricate corporate conglomerate associates or, equally pressing, industry-wide labor controversies. Behind this judgment, of course, was the congressional conviction that quite without regard to the motives or methods of particular individuals engaging in it, the persuader business was detrimental to good labor relations and the continued public interest. Since a principal object of LMRDA was neutralizing the evils of persuaders, it was quite legitimate and consistent with the Act's main sanction of goldfishbowl publicity to turn the spotlight on the lawyer who wanted not only to serve clients in labor relations matters encompassed within § 203(c) but who wanted also to wander into the legislatively suspect field of a persuader.

*Id.* at 650 (footnotes omitted). We find the fact that the attorneys identified themselves to the Southern Silk employees did not remove them from the ambit of LMRDA section 203(b).

### B.

▮ Appellant contends that even if it is required to file the reports contemplated by section 203(b), that section 203(c) relieves its persuader-attorneys from the necessity of reporting information regarding the clients for whom it performs no persuader services. Section 203(c)[7] exempts persons advising an employer or representing an employer before a court, agency or administrative tribunal and persons engaging in negotiations or arbitration on behalf of an employer from the reporting requirements of section 203(b). This court agrees with the majority of courts[8] that find the purpose of section 203(c) is to clarify what

---

7. Section 203(c) provides:
 Nothing in this section shall be construed to require any employer or other person to file a report covering the services of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such em-

ployer with respect to wages, hours, or other terms or conditions of employment or the negotiation of an agreement or any question arising thereunder.

8. *See Price v. Wirtz,* 412 F.2d 647, 649 (5th Cir.1969) (en banc); *Douglas v. Wirtz,* 353 F.2d 30, 32 (4th Cir.1965), *cert. denied,* 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665 (1966).

is implicit in section 203(b)—that attorneys engaged in the usual practice of labor law are not obligated to report under section 203(b).[9]

■ We determine that section 203(c) means that as long as an attorney confines himself to the activities set forth in section 203(c), he need not report, but if he crosses the boundary between the practice of labor law and persuasion, he is subject to the extensive reporting requirements. As the Fifth Circuit stated in *Price v. Wirtz*, 412 F.2d 647, 651 (5th Cir.1969) (en banc):

> It boils down to this. As long as the attorney limits himself to the activities set forth in § 203(c) [rendering advice and representing a client in proceedings or in bargaining], he need not report. Engaging in such advice or collective bargaining does not give rise to a duty to report. No report is set in motion "by reason of" his doing those things. What sets the reporting in motion is performing persuader activities. Once that duty arises, § 203(c) does not insulate from reporting the matters in § 203(b) for non-persuader clients.

Once HH & M's partners engaged in persuasion and the duty to report arose, section 203(c) ceased to shield the persuader attorneys' law firm from reporting the matters described in section 203(b) regarding their non-persuader clients.

## C.

■ The appellant contends that even if it is subject to the reporting requirements of section 203, the requested information is protected by the attorney-client privilege recognized in section 204.[10] This is an issue of first impression.[11] Appellant contends that the attorney-client privilege codified in LMRDA section 204 is broader than the traditional attorney-client privilege. We find to the contrary, that in section 204 Congress intended to accord the same privilege as that provided by the common-law attorney-client privilege.

### 1.

On March 22, 1958, Senator John F. Kennedy introduced S. 1555. As introduced by Senator Kennedy, S. 1555 contained no provision codifying the attorney-client privilege. Senator Kennedy believed that attorneys were adequately protected under the

---

**9.** Congress recognized that the ordinary practice of labor law does not encompass persuasive activities. As the Fourth Circuit stated in *Douglas v. Wirtz*, 353 F.2d 30, 33 (4th Cir.1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665 (1966):

> Primarily, as the legislative history records, the [disclosure] requirement is directed to labor consultants. Their work is not necessarily a lawyer's. Indeed, for a legal adviser it would be extracurricular. True, a client may desire such extra-professional services, but, if so, the attorney must balance the benefits with the obligations incident to the undertaking.

**10.** Section 204 provides:

> Nothing contained in this chapter shall be construed to require an attorney who is a member in good standing of the bar of any State, to include in any report required to be filed pursuant to the provisions of this chapter any information which was lawfully communicated to such attorney by any of his clients in the course of a legitimate attorney-client relationship.

**11.** Neither *Douglas v. Wirtz*, 353 F.2d 30 (4th Cir.1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 893, 15 L.Ed.2d 665 (1966), nor *Price v. Wirtz*,

412 F.2d 647 (5th Cir.1969) (en banc), reached the issue whether LMRDA § 204 exempts attorneys from disclosing certain categories of information required by LMRDA § 203(b). In *Wirtz v. Fowler*, 372 F.2d 315 (5th Cir.1966), *overruled in part*, *Price v. Wirtz*, 412 F.2d 647 (5th Cir. 1969) (en banc), the court stated that it was not required to determine the scope of § 204, yet it proceeded to do just that. 372 F.2d at 332. The *Fowler* court found that § 204 did not prevent the disclosure of any information required under § 203. The court opined that in order to be meaningful, a report required under § 203 must include the name of the client, the terms of the persuader arrangement, and the fees involved. The court concluded that § 204 was "roughly parallel [to] the common-law attorney-client privilege" and found that the common law privilege would not prevent the disclosure of the required information by an attorney-persuader. *Id.* The court remarked that the privilege, which belongs to the client rather than to the attorney, only protects confidential information. The court recognized that a client's identity or the amount of fees paid ordinarily does not constitute confidential information.

provision in his bill that eventually became LMRDA section 203. Senator Goldwater, however, vigorously advocated an amendment to S. 1555 that would codify the attorney-client privilege. Senator Kennedy, who referred to the Goldwater amendment as "the amendment which takes care of the lawyers," 105 Cong.Rec. 1161 (1959), originally opposed the amendment. Senator Kennedy accepted the amendment only after satisfying himself that the scope of the amendment, now codified at LMRDA section 204, did not exceed that of the traditional attorney-client privilege. The following exchange took place on the floor of the Senate.

Mr. Goldwater. The amendment specifically exempts from the reporting requirements of the bill any communications between an attorney and his client. I do not know how I can explain the amendment any more completely than that. I think every attorney and every Member of this body understands the historic relationship and sanctity of such communications. I hope the Senator from Massachusetts will accept the amendment.

Mr. Kennedy. Mr. President, I am prepared to accept the amendment. As I understand, it is the amendment which takes care of the lawyers.

Mr. Goldwater. That is correct.

Mr. Kennedy. It goes against my grain to accept the amendment, because no bar association in the United States, as of tonight, has moved against one lawyer who has come before the McClellan committee and who has participated, in one way or another, in the improper practices which have been found....

Mr. Goldwater. I am not any happier than is the Senator from Massachusetts about the activities of some of the attorneys who appeared before the committee. But as a layman I recognize that there must be lawyers to represent these people, whether we like the people or not. As a layman, I believe that there should be a perpetuation of the sanctity of relations between attorney and client. I know that if I were involved in a situation in which an attorney was represent-

ing me, and a report had to be made, I would not want all of the intimate details of communications between the attorney and me to become public property....

Mr. Kennedy. I was not referring to the lawyers who represent criminals, however obnoxious they may be. I was referring to lawyers who deal collusively with crooked unions, crooken union leaders, or crooked employers, and then, in an attempt to protect themselves, justify their actions on the basis of a confidential relationship....

....

Mr. Dirksen. Unless I have been laboring under a delusion for the last 20 years as a member of the bar, it is my understanding that the safeguard of the lawyer-client relationship was designed not to safeguard or protect the lawyer, but the client. I am not so certain that the distinguished Senator from Massachusetts has been under a misapprehension about it.

Mr. Kennedy. If the Senator from Illinois had sat on the McClellan committee, he would understand that the practice works both ways.

Mr. Dirksen. But that was not the reason it was designed in the first instance, when it was written into the law. The idea was that when a client came into a lawyer's office and laid out his confessional story, a confidential relationship was created, and the lawyer could not be brought into court to testify to the conversations between his client and himself. The law was not designed to defend the lawyer; it was designed to safeguard the American citizen who hired the lawyer.

Mr. Kennedy. There is no doubt in my mind that the bill which was originally drafted by lawyers adequately protected them. Therefore, I do not feel that the amendment offered by the Senator from Arizona is wholly necessary. But in order that there may be no question about it, I will accept the amendment....

Mr. Dirksen.... [I] think it is important to anchor the fundamental reason or pur-

pose for protecting this relationship. It has existed since time immemorial. It was designed to protect the client against harassment in case somebody tried to compel him, by process or otherwise, to disclose conversations, confessions, and statements which might have been interchanged between lawyer and client.

Mr. Kennedy. Mr. President, I am delighted to accept the amendment—I mean to say I accept the amendment. 105 Cong.Rec. 19759–62 (1959).

The American Bar Association, which was concerned about the ramifications the proposed legislation might have upon attorneys, adopted a resolution at its 1959 midwinter meeting which stated:

*Resolved,* That the American Bar Association urges that in any proposed legislation in the labor management field, the traditional confidential relationship between attorney and client be preserved, and that no such legislation should require report or disclosure, by either attorney or client, of any matter which has traditionally been considered as confidential between a client and his attorney, including but not limited to the existence of the relationship of attorney and client, the financial details thereof, and any advice or activities of the attorney on behalf of his client which fall within the scope of the legitimate practice of law....

The House version of LMRDA section 204 contained an attorney-client exclusion almost identical to the ABA proposal. The House version provided:

Attorney-Client Communications Exempted

Sec. 204. Nothing contained in this Act shall be construed to require an attorney who is a member in good standing of the bar in any State, or any client of such an attorney, to include in any report required to be filed pursuant to the provisions of this Act any information which is confidential between the attorney and such client in the course of a legitimate attorney-client relationship, including but not limited to the existence of the relationship of attorney and client, the financial details thereof, or any information obtained, advice given, or activities carried on by the attorney within the scope of the legitimate practice of law.

H.R. 8342, 86th Cong., 2d Sess. § 204 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318. The House Report accompanying H.R. 8342 stated "[t]he purpose of this section is to protect the traditional confidential relationship between attorney and client from any infringement or encroachment under the reporting provisions of the committee bill." H.R.Rep. No. 741, 86th Cong., 2d Sess. 37 (1959), U.S.Code Cong. & Admin.News 1959, p. 2459. The House version of the bill, and by implication the ABA Resolution, was rejected by the Conference Committee. The Senate version of the bill, S. 1555, which contained a much narrower attorney-client privilege, was enacted into law as LMRDA section 204. The Conference Committee Report states:

The Senate bill provides that an attorney need not include in any report required by the act any information which was lawfully communicated to such attorney by any of his clients in the course of a legitimate attorney-client relationship. The conference substitute adopts the provisions of the Senate bill, but in connection therewith the conferees included, in section 203(c), a provision taken from the Senate bill that provides that an employer or other person is not required to file a report covering the services of such person by reason of his giving or agreeing to give advice to such employer or representing or agreeing to represent such employer before any court, administrative agency, or tribunal of arbitration or engaging or agreeing to engage in collective bargaining on behalf of such employer or the negotiation of an agreement or any question arising thereunder.

H.R.Rep. No. 1147, 86th Cong., 2d Sess. 33 (1959), U.S.Code Cong. & Admin.News 1959, p. 2505.

We find that in contending that the attorney-client privilege contained in section 204 exceeds the scope of the traditional attorney-client privilege, the appellant has misconstrued the statute. Our review of the legislative history convinces this court that in LMRDA section 204, Congress intended to accord the same protection as that provided by the common-law attorney-client privilege.

## 2.

▮ This court [12] set forth the essential elements of the attorney-client privilege in *United States v. Goldfarb*, 328 F.2d 280 (6th Cir.), *cert. denied*, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), as follows:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Id.* at 281, (quoting 8 J. Wigmore, *Evidence in Trials At Common Law* § 2292, at 554 (McNaughton rev. 1961)). In *Goldfarb*, this court recognized that the attorney-client privilege "does not envelope everything arising from the existence of an attorney-client relationship" and emphasized that "the attorney-client privilege is an exception carved from the rule requiring full disclosure, and as an exception, should not be extended to accomplish more than its purpose." 328 F.2d at 282. *See also United States v. Bartone*, 400 F.2d 459, 461 (6th Cir.1968) (attorney-client privilege is not all inclusive), *cert. denied*, 393 U.S. 1027, 89 S.Ct. 631, 21 L.Ed.2d 571 (1969).

▮ The attorney-client privilege only precludes disclosure of *communications* between attorney and client and does not protect against disclosure of the facts underlying the communication. *Upjohn Co.*

*v. United States*, 449 U.S. 383, 395, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981). In general, the fact of legal consultation or employment, clients' identities, attorney's fees, and the scope and nature of employment are not deemed privileged. In *In re Grand Jury Investigation No. 83–2–35*, 723 F.2d 447 (6th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984), this court reiterated the principle that the attorney-client privilege should be narrowly construed and held that the attorney-client privilege does not protect the identity of a client except in very limited circumstances. In *United States v. Haddad*, 527 F.2d 537, 538–39 (6th Cir. 1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 797 (1976), this court held that the amount of money paid or owed by a client to his attorney is not privileged except in exceptional circumstances not present in the instant case. We conclude that none of the information that LMRDA section 203(b) requires to be reported runs counter to the common-law attorney-client privilege. Any other interpretation of the privilege created by section 204 would render section 203(b) nugatory as to persuader lawyers.

## III.

HH & M contends that the disclosure requirements are unconstitutional in that they infringe upon its free speech and associational rights guaranteed by the first amendment. In essence, the contention here is that it will be deterred from exercising its right of free speech by making persuader speeches for its clients if, by doing so, it will be compelled to file the reports required by section 203(b). The argument is that a law firm such as HH & M would be reluctant to place on public record its payments to its partners, associates and employees and that labor relations clients would be reluctant to employ a law firm that, because of its persuader status

12. The court below erroneously applied the Tennessee law of attorney-client privilege. Although Federal Rule of Evidence 501 does not apply in the instant case, we follow it by analogy and find that the federal common-law of attorney-client privilege governs the instant dispute.

with respect to some clients, is compelled to place their payments to the firm on public record. Thus, argues HH & M, its free speech and associational rights are unconstitutionally chilled by the requirement that it comply with section 203(b). The Secretary concedes that HH & M's right to make otherwise legal persuader speeches for its clients is protected by the first amendment but contends that the requirement that the information be filed with the Secretary does not unconstitutionally chill HH & M's exercise of its free speech and associational rights.

In dealing with this contention, we agree with the analytical framework employed by the Fourth Circuit in *Master Printers of America v. Donovan, Secretary of Labor*, 751 F.2d 700 (4th Cir.1984), which involved a constitutional attack on section 203(b). Master Printers is a trade association to which nonunion printing firms belong. It distributed a publication to its employer members and to some of their employees which, among other things, argued against union membership by printing employees. The Secretary determined that this activity was persuader activity and that therefore it must file the reports required by section 203(b) as to its membership. Without reciting the long history of this litigation, suffice it to say that it reached the Fourth Circuit for the third time on the narrow issue of the constitutionality of section 203(b) as applied to Master Printers. This trade association contended that its free speech and associational rights were unconstitutionally infringed by the report requirements because compliance with them would deter membership by employers.

The *Master Printers* court recognized that the Supreme Court had declared unconstitutional compelled disclosure of membership in groups involved in advocacy, such as in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and that in doing so, the Court held that disclosure laws that significantly encroach on such associational rights must survive exacting scrutiny. The

court in *Master Printers* then set out the analytical framework for testing Master Printers' claim that the reporting requirements are unconstitutional:

> [O]ur analysis must focus on four factors: the degree of infringement on first amendment rights; the importance of the governmental interest protected by the Act; whether a "substantial relation" exists between the governmental interest and the information required to be disclosed; and the closeness of the "fit" between the Act and the governmental interest it purports to further.

751 F.2d at 704.

This court must weigh these four factors in order to determine whether the burden imposed on HH & M's exercise of its free speech and associational rights, assuming such a burden exists, is justified by the government's interest in maintaining antiseptic conditions in the labor relations setting.

### A.

As the *Master Printers* court stated, "[a] finding of a substantial 'chill' on protected first amendment rights requires a showing that the statutory scheme will result in threats, harassment, or reprisals to specific individuals." *Id.* at 704 (citing *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S.Ct. 612, 661, 46 L.Ed.2d 659 (1976)); *NAACP*, 357 U.S. at 462–63, 78 S.Ct. at 1171–72 (1958).

In *NAACP*, the Court found that the statutorily mandated disclosures of the NAACP's membership lists were not warranted because the NAACP had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed these members to economic reprisal, loss of employment, threat of physical coercion and manifestations of public hostility." *NAACP*, 357 U.S. at 462, 78 S.Ct. at 1172. In *Buckley v. Valeo*, the seminal case on the constitutionality of compelled disclosures in the first amendment context, the Court upheld the constitutionality of the disclosure re-

quirements of the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.* (1982). In rejecting the complaining parties' arguments that portions of the Act violated the rights of minority parties and independent candidates, the *Buckley* Court pointed out that "no appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama.*" 424 U.S. at 71, 96 S.Ct. at 659–60. The Court found that individual exceptions from the reporting requirements were justified when a party proved "only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* at 74, 96 S.Ct. at 661.

William P. Hutcheson, one of HH & M's partners, submitted an affidavit dated April 15, 1981, in which he avers that if HH & M is compelled to file Form LM–21 and include therein all the information required by section 203(b), he fears that clients of the firm who are listed on the LM–21 Form will suffer reprisals and retaliation from private parties and government officials. Mr. Hutcheson cites several bases for his fear. He maintains that the Amalgamated Clothing Textile Workers Union, angered because it lost the election at Southern Silk Mills, intends to harm HH & M. Hutcheson argues that ACTWU, which Hutcheson avers "has engaged in numerous acts of violence in and around Chattanooga, Tennessee," will use the information contained in a Form LM–21 report to embarrass the firm's clients, with whom ACTWU has no dispute whatsoever "solely in an effort to harm Humphreys, Hutcheson & Moseley." Hutcheson suggests that ACTWU may use the LM–21 Form to compile an "enemies list" and urge its members to boycott the firms included in the list. In addition, Hutcheson avers that the Secretary of Labor may harass the clients listed on the LM–21 Form even though they had no dealings whatsoever with labor unions and even though Humphreys, Hutcheson & Moseley performed no persuader services for them."

We find these allegations regarding the actions of the ACTWU and the Secretary of Labor to be speculation. Like the *Master Printers* court, "we do not believe that the evidence and allegations of first amendment infringement here constitute the sort of threat of physical harm and loss of employment found in *NAACP v. Alabama* and its progeny." 751 F.2d at 704. *See also Donovan v. Master Printers Association,* 532 F.Supp. 1140, 1148 n. 11 (N.D.Ill.1981) (court found that members' allegations fell far below the level of reprisals articulated in *NAACP v. Alabama* and its progeny), *aff'd and adopted,* 699 F.2d 370 (7th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 169 (1984).

Because HH & M has failed to establish that the report requirements contained in section 203(b) as applied to it produce a "deterrent effect" akin to that present in *NAACP,* we conclude that the report requirements do not substantially burden HH & M's first amendment rights.

**B.**

Although we determined that HH & M's allegations of the chill upon its first amendment rights are not substantial, we find that the chill is not inconsequential. Therefore, we must look further to determine whether this disclosure legislation is narrowly tailored to serve a compelling governmental interest. As the *Buckley* Court stated, "there are governmental interests sufficiently important to outweigh the possibility of infringement [upon first amendment rights], particularly when the 'free functioning of our national institutions' is involved." 424 U.S. at 66, 96 S.Ct. at 657 (quoting *Communist Party v. Subversive Activities Control Board,* 367 U.S. 1, 97, 81 S.Ct. 1357, 1411, 6 L.Ed.2d 625 (1961)). Among these compelling interests, holds *Master Printers,* are "deterring actual corruption" in the labor field and "bolstering [the government's] own ability to investigate 'in order to act and protect.'" 751 F.2d at 707 (quoting *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 544, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963)). Like the *Master Printers* court, we find that the government's compelling interest in maintaining harmonious labor re-

lations outweighs the chill placed upon HH & M's exercise of its first amendment rights.

### C.

We agree with the Fourth Circuit's conclusion that the disclosures required by section 203(b) of the Act are "unquestionably 'substantially related' " to the government's compelling interest in deterring corruption in the labor relations field. *Master Printers,* 751 F.2d at 707. Our conclusions are supported by the evidence of persuaders' track record of illegal conduct as developed by the McClellan Committee Hearings and contained in the legislative history of the LMRDA. We find that the disclosure requirements aid employees in understanding the source of the information they receive, tend to discourage abuse, reduce the appearance of impropriety and supply information to the Secretary that will aid in detecting violations.

### D.

 Like the *Master Printers* court, we find that the persuader provisions are carefully tailored so that first amendment freedoms are not needlessly curtailed. *Id.* at 708. We conclude, therefore, that HH & M's contentions that disclosures regarding clients for whom the firm performed no persuader activities have no relation to the government's compelling interest in preserving harmonious labor relations are without merit. Congress determined that only extensive financial disclosure by persuaders would curb the abuses by these middlemen. S.Rep. No. 187, 86th Cong., 1st Sess. at 10. As the *Master Printers* court stated:

> In order to deter both actual corruption and the appearance of corruption, Congress concluded that it would be necessary to require the disclosure of a wideranging number of employers and activities, even if it meant reporting activities that were not improper.

*Id.* at 708.

HH & M contends that the disclosure requirements do not conform closely to the government's compelling interest because the reports required by section 203(b) often

are not filed until after an election takes place and thus do not serve the government's interest in maintaining laboratory conditions during labor elections. Although the required reports may not be filed until after an election, we find that these reports nevertheless serve the government's interest in ensuring fair labor elections. Requiring disclosure, even after the fact, will inhibit and expose illegal and unethical actions by persuaders that hamper employees in the exercise of their rights guaranteed by the NLRA. The reports also enable employees in the labor relations setting, like voters in the political arena, to understand the source of the information they are given during the course of a labor election campaign. Past reports that disclose the interests of persuaders serve as a valuable source of information in current elections. In addition, the reporting mechanism promotes industrial peace by ensuring the enforcement of the labor laws. The annual reports serve as a cross-check on the accuracy of the thirty day reports, and the annual reports notify the Secretary of the relationships between persuaders and employers which may give rise to the duties to file thirty day reports. We conclude that both the thirty day and the annual reports serve the government's compelling interest in maintaining antiseptic conditions in the labor relations field. Therefore, we agree with the Fourth Circuit's conclusion that the statute is not overly broad. *Id.* at 709–10.

### E.

We have balanced the four factors set forth by the *Master Printers* court, at 704, and like the Fourth Circuit we hold that when the four factors of the *Buckley* balancing test are carefully weighed, it is clear that the government's interests advanced by the statute are compelling, the degree of infringement is minimal, the purpose of the statute is substantially related to its requirements, and the level of disclosure required is carefully tailored to the goals of the statute.

We further point out that, in addition to *Master Printers,* every court that has considered the issue has held that the report

requirements contained in section 203(b) are constitutional. *Marshall v. Stevens People and Friends for Freedom,* 669 F.2d 171 (4th Cir.1981), *cert. dismissed sub nom. J.P. Stevens Employees Education Committee v. Donovan,* 455 U.S. 930, 102 S.Ct. 1297, 71 L.Ed.2d 639 (1982), *cert. denied sub nom. Ramsey v. Donovan,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982); *Wirtz v. Fowler,* 372 F.2d 315 (5th Cir.1966), *overruled in part, Price v. Wirtz,* 412 F.2d 647 (5th Cir.1969) (en banc); *Donovan v. Master Printers Association,* 532 F.Supp. 1140 (E.D.Ill.1981), *aff'd and adopted,* 699 F.2d 370 (7th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

The judgment of the district court is therefore AFFIRMED.